Jennifer Pasquarello, Pro Se Plaintiff
Michelle Angelina, Pro Se Plaintiff
Edna Mahan Correctional Facility
30 County Rt. 513
Clinton, N.J., 08809

### UNITED STATES DISTRICT COURT
For the District of New Jersey
Vicinage of Trenton

------------------------------------

| | | |
|---|---|---|
| JENNIFER PASQUARELLO, | : | |
| MICHELLE ANGELINA, | : | CIVIL ACTION NUMBER: 3:21-cv-18806 |
| On Behalf of Themselves and All | : | (ZNQ-DEA) |
| Other Similarly Situated Women, | : | |
| Pro Se PLAINTIFFS | : | STATE COURT DOCKET: HNT-L-000273-21 |
| | : | |
| Vs. | : | |
| | : | **NOTICE OF MOTION FOR PRELIMINARY** |
| PHIL MURPHY, MARCUS HICKS/ | : | **INJUNCTION** |
| Ms. KUHN, AL KANDELL, | : | |
| PATRICIA McGILL, DEMETRIUS | : | |
| MINOR, CARLOS MARTINEZ, | : | |
| DEFENDANTS | : | |

    PLEASE TAKE NOTICE that the *pro se* Plaintiffs, Jennifer Pasquarello
and Michelle Angelina, will move before the Honorable Zahid N. Quraishi,
U.S.D.J., on the date of January 7, 2022 at the Clarkson S. Fisher U.S.
Courthouse, 402 East State Street, Trenton, N.J., for a Preliminary
Injunction to enjoin, direct and compel the state defendants to take
immediate action to separate the pre-operative male-to-female transsexual
inmates from the Edna Mahan Correctional Facility for Women, and place those
inmates in another correctional facility.

    Please Take Further Notice that the plaintiffs bring this motion
pursuant to the provisions of Fed.R.Civ.P. 65, Fed.R.Civ.P. 7, New Jersey
Court Rule 4:52-2, New Jersey Court Rule 1:6-2, and the Due Process Clauses
of the United States and New Jersey Constitutions.

    In support of this motion, plaintiffs rely upon the brief and
certifications annexed and submitted herewith. Plaintiffs do request oral
argument on this motion and request that this Court require the NJDOC to
produce them in court for the hearing, unless counsel has been assigned to
represent the plaintiffs and plaintiff class.

Dated: ×November 30 2021

×_Jennifer Pasquarello_
Jennifer Pasquarello, Pro Se

Dated: ×November 30th 2021

_Michelle Angelina, Pro Se_

21

Jennifer Pasquarello, Pro Se Plaintiff
Michelle Angelina, Pro Se Plaintiff
Edna Mahan Correctional Facility
30 County Rt. 513
Clinton, N.J., 08809

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Vicinage of Trenton

----------------------------------------------

| | | |
|---|---|---|
| JENNIFER PASQUARELLO, | : | |
| MICHELLE ANGELINA, | : | Civil Action Number: 3:21-cv-18806 (ZNQ) |
| On Behalf of Themselves and All | : | |
| Other Similarly Situated Women, | : | State Court Docket:HNT-L-00273-21 |
| Pro Se PLAINTIFFS | : | |
| | : | |
| vs. | : | |
| | : | |
| PHIL MURPHY, MARCUS HICKS/ | : | |
| Ms. KUHN, AL KANDELL, PATRICIA | : | **MOTION FOR PRELIMINARY INJUNCTION** |
| McGILL, DEMETRIUS MINOR, | : | |
| CARLOS MARTINEZ, | : | |
| DEFENDANTS | : | |

---

BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

To The Court:

    Please accept this letter brief in support of the legal arguments of plaintiffs in their motion for a preliminary injunction in the above-referenced civil matter.


Dated: ___November 30th___, 2021


x_____
Jennifer Pasquarello, Plaintiff

x_____
Michelle Angelina, Plaintiff

# TABLE OF CONTENTS

| Subject | Page |
|---|---|
| Statement of the Case | 1 |
| Point One: This Court Should Grant Plaintiffs' Motion Because Plaintiffs Meet The Criteria For Issuance Of a Preliminary Injunction | 2 |
| Conclusion | 13 |

| Table of Citations | Page |
|---|---|
| Adams v. Freedom Forge Corp., 204 F.3d 475 (CA3 2000) | 11 |
| Anderson v. Davila, 125 F.3d 148 (CA3 1997) | 11 |
| Chesimard v. Mulcahy, 470 F.2d 1184 (CA3 1978) | 5 |
| Crosby v. Reynolds, 763 F.Supp. 666 (D.Me. 1991) | 7 |
| Crowe v. DiGioia, 90 N.J. 126 (1982) | 2,4,7,8,9,10 |
| Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917 (CA3 1974) | 3 |
| DeVeloz v. Miami Dade County, 756 Fed.Appx. 869 (CA11 2018) | 5 |
| Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673 (1976) | 8,11 |
| Estate of DiMarco v. Wyoming D.O.C., 473 F.3d 1334 (CA10 2007) | 5 |
| Fres-Co. Systems, USA v. Hawkins, 690 Fed.Appx. 72 (CA3 2017) | 3,4 |
| Hohe v. Casey, 868 F.2d 69 (CA3 1989) | 11,12 |
| In re DeLorean Motor Co., 755 F.2d 1223 (CA6 1985) | 4 |
| Jane Doe v. Mass. Dept. of Corrections, 2018 U.S.Dist. LEXIS 99925 (D.Mass. 2018) | 7 |
| Janiah v. Baldwin, 424 F.Supp.2d 526 (S.D.Ill. 2019) | 6 |
| John T. v. Delaware County, 318 F.3d 545 (CA3 2003) | 12 |
| Jones v. Hayman, 418 N.J. Super. 291 (A.D. 2011) | 8,9,10 |
| Kosilek v. Spencer, 774 F.3d 63 (CA1 2014) | 5 |
| Lamb v. Maschner, 633 F.Supp. 351 (D.Kan. 1986) | 4 |
| Lamb v. Norwood, 262 F.Supp.2d 1151 (D.Kan. 2017) | 6 |
| Lopez v. City of New York, 2009 U.S. Dist. LEXIS 7645 (S.D.N.Y. 2009) | 5 |
| Newsome v. Norris, 888 F.2d 371 (CA6 1989) | 11 |
| Oburn v. Shapp, 521 F.2d 142 (CA3 1975) | 3 |
| Playboy Enterprises, Inc. v. Meese, 639 F.Supp. 581 (D.D.C. 1986) | 13 |
| Reilly v. City of Harrisburg, 858 F.3d 173 (CA3 2017) | 3 |
| Singer Management Consultants v. Milgram, 650 F.3d 223 (CA3 2011) | 12 |
| Smith v. Bingham, 914 F.2d 740 (CA5 1990) | 5 |
| Tilden Recreational Vehicles, Inc. v. Belair, 786 Fed.Appx. 335 (CA3 2019) | 3 |

| Court Rules Cited | Page |
|---|---|
| New Jersey Court Rule 4:52 | 2 |
| Federal Rule of Civil Procedure 65 | 2,11 |

| Statutes Cited | Page |
|---|---|
| N.J.S.A. 30:4-154 | 4 |
| N.J.S.A. 52:14B-1, et.seq. | 1 |
| Title 42 U.S.C. Section 1983 | 1 |

## STATEMENT OF THE CASE

This is a civil rights action under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, et,.seq., and the federal civil rights statute, Title 42 U.S.C. Section 1983, and alleging violations of rights secured to the named plaintiffs, and the class of inmates they represent, under the United States and New Jersey Constitutions, to wit: the right to privacy, the right to freedom from danger, the right to freedom from cruel and unusual punishment, the right to freedom from outrageous governmental conduct under substantive due process protections, and possibly other rights enshrined in the United States and New Jersey Constitutions.  Plaintiffs also alleged a violation of the New Jersey Administrative Procedures Act (APA), N.J.S.A. 52:14B-1, et.seq., The gist of the complaint is that the actions of the named defendants, and their agents and employees, by placing pre-operative male-to-female transgender inmates who possess male genitalia, musculature, mannerisms, and attitudes in the same housing units as the female inmate population at EMCFW, have violated the constitutional rights of the women confined at the EMCFW prison. Plaintiffs seek equitable relief, a declaratory judgment, and damages.

This motion seeks a preliminary injunction for the relief requested herein.

1

**LEGAL ARGUMENT**

**POINT ONE**

THIS COURT SHOULD GRANT PLAINTIFFS' MOTION BECAUSE
PLAINTIFFS MEET THE CRITERIA FOR ISSUANCE OF A
PRELIMINARY INJUNCTION

A court has the authority to enter a preliminary injunction under New Jersey Court Rule 4:52 and Federal Rule of Civil Procedure 65. The criteria for obtaining a preliminary injunction are similar in both forums.  Under *Crowe v. De Gioia*, 90 N.J. 126, 132-34, (1982), a party seeking a preliminary injunction must satisfy the following:

(1)   a preliminary injunction should not issue except when necessary to prevent irreparable harm. Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages. 90 N.J. at 132-33. In certain circumstances, severe personal inconvenience can constitute irreparable injury justifying issuance of injunctive relief. *Ibid.* Pecuniary damages may be inadequate because of the nature of the injury or of the right affected.  90 N.J. at 133.

(2)   temporary relief should be withheld when the legal right underlying plaintiff's claim is unsettled. 90 N.J. at 133. If, however, the legal right is settled, then injunctive relief is possible.

(3)   preliminary injunction should not issue where all material facts are controverted. 90 N.J. at 133. To prevail on an application for temporary relief, a plaintiff must make a preliminary showing of a reasonable probability of ultimate success on the merits. 90 N.J. at 133.

(4)   the relative hardship to the parties in granting or denying relief. 90 N.J. at 134. Would the party seeking the injunction suffer more if the injunction were withheld than the defendant would suffer if the junction were granted.

Under Rule 65, Fed.R.Civ.P., a party seeking a preliminary injunction must also meet four prongs:

(1)   a reasonable probability of eventual success in the litigation, and

(2)   that the moving party will be irreparably injured . . . if relief is not granted.

2

> (3)   [In addition,] the district court should take into account, when they are relevant, the possibility of harm to other interested persons from the grant or denial of the injunction (balance of equities), and
>
> (4)   the public interest.

*Reilly v. City of Harrisburg,* 858 F.3d 173 (CA3 2017) (citing *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919-20 (3d Cir. 1974)). A district court- in its sound discretion- should balance those four factors so long as the party seeking the injunction meets the threshold on the first two. *See, Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975). Put another way, A movant for a preliminary injunction must first satisfy the two "most critical" factors: the movant must show "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." *Tilden Recreational Vehicles, Inc. v. Belair*, 786 Fed. Appx. 335, 339 (CA3 2019). If these two factors are met, the District Court balances them in its equitable discretion alongside two others: "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Id.* At 339-340.

The relative strength of the four factors will typically vary, and some may weigh more heavily than others in the trial court's assessment of whether relief is warranted. *Fres-Co. Systems, USA v. Hawkins*, 690 Fed. Appx. 72, 75 (CA3 2017). At least one federal circuit has held that "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required to support a grant of a preliminary injunction may depend on the strength of the other factors considered." See *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (CA6 1985).

3

Turning to the facts of this particular case, plaintiffs can meet the four *Crowe* factors.  Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages. This applies to severe personal inconvenience as well. In this case, the plaintiffs complain that the presence of pre-operative male-to-female transgender inmates has resulted in danger to the female inmate population (including plaintiffs themselves) from physical and sexual violence, derogatory verbal comments, bullying, harassment and intimidation, and favoritism shown toward the male inmates.  (See plaintiff's certifications).  Even if no actual physical harm befalls plaintiffs (and physical harm has occurred to some class members), they have suffered emotional harm and other women have suffered physical harm.  The nature of the non-physical damages the class of plaintiffs is not readily amenable to monetary damages because mental harm is not easily quantifiable.

The second *Crowe* factor is whether the legal right at issue is settled or unsettled.  Plaintiffs submit that the legal right of female prison inmates not to be housed in the same units as male seems to be well-settled.  There is authority on this point:

- *Lamb v. Maschner,* 633 F.Supp. 351, 353 (D.Kan. 1986)(male transsexual who sought court order to be transferred to female prison denied, with court stating "A male prisoner cannot be housed in a women's prison… even though a transfer may relieve plaintiff's anxieties, clearly a violation of the women's rights would be at issue")
- *Lopez v. City of New York,* 2009 U.S. Dist. LEXIS 7645 at 41-42 (male transsexual who sought to be housed in women's wing of jail was denied, with court stating that the U.S. Supreme Court did not object to the practice of housing preoperative transsexuals with prisoners of like biological sex and that "a number of problems could arise by altering this practice and housing biological males who identify as transgender with the female population, not the least of which would be concerns for the safety of the female inmates…")
- N.J.S.A. 30:4-154 (stating that "any **female** above the age of 14 years, convicted of a crime and sentenced to a term of

4

imprisonment, shall be committed to the custody of the Commissioner
of Corrections and may be confined in the Correctional Institution
for Women")(emphasis added).  The statute mentions nothing
about male inmates being confined at EMCFW.

- *Smith v. Bingham*, 914 F.2d 740 (CA5 1990)(cisgender male inmate who
  was housed in special pod in female prison to provide support
  services for prison sued to be permitted to attend vocational
  programs with female inmates and was denied, with court noting that
  prison officials had valid security concerns to prohibit inter-
  mingling of male and female inmates;

- *DeVeloz v. Miami Dade County*, 756 Fed. Appx. 869, 880 (CA11
  2018)(denying qualified immunity to jail doctor and nurse who
  mistakenly assumed biological female was a male transgender and
  ordering her placed in male housing unit; the court pointed out
  that "every reasonable prison officer and medical personnel would
  have known that wrongfully misclassifying a biological female as a
  male inmate and placing that female in the male population of a
  detention facility was unlawful").[1]

- *Chesimard v. Mulcahy,* 570 F.2d 1184 (CA3 1978)(female inmate who
  was temporarily confined in higher security men's prison in special
  unit filed suit, challenging constitutionality of her confinement
  in a men's prison.  In dicta, NJDOC Deputy Commissioner Fauver
  stated "it is the professional opinion of the officials of the
  Department of Corrections that…Ms. Chesimard should be transferred
  to an out-of-state facility" where she can be securely imprisoned
  in the company of other women," thus implicitly recognizing the
  impropriety of coeducational prison units).

- *Kosilek v. Spencer,* 774 F.3d 63, 92-93 (CA1 2014)(noting and giving
  deference to the Mass. DOC security concerns about declining to
  house a post-operative male-to-female transsexual in women's prison
  among the factors in refusing to order the MDOC to provide surgery
  to the inmate because the inmate was incarcerated for murdering
  wife and had a history of assaultive behavior toward women).

- *Estate of DiMarco v. Wyoming Dept. of Corrections*, 473 F.3d 1334
  (CA10 2007)(reversing the district court's judgment in favor of
  transgender/hermaphrodite inmate who sued officials because of
  being placed in administrative segregation after erroneously being
  sent to women's prison by the sentencing court, and upholding
  prison officials' decision to place inmate in segregation and their
  concerns of security risk if the inmate were released into general
  population at women's prison).

---

[1] In *DeVeloz* the issue was a cisgender woman placed in a male cell block at the county jail,
but the exact same logic would apply to placing biological male inmates in a women's cell
block at EMCFW.

- *Lamb v. Norwood,* 262 F.Supp.2d 1151 (D.Kan. 2017)(rejecting claim by pre-operative male-to-female transsexual inmate who sought, inter alia, transfer to a women's prison, stating that " Lamb is not entitled to transfer to a female facility…although Lamb argues that transfer does not raise serious safety and security concerns, the Court cannot overlook the heinous crimes for which Lamb is serving three life sentences. Thomas Lamb murdered Karen Sue Kemmerly-a woman. Shortly thereafter, he kidnapped Patricia Ann Childs-another woman-and forced her to have sex with him while she was held against her will. Thomas was ordered to serve three life sentences so that he would never kill or hurt another woman again. Thomas is now Michelle, but Michelle is still a convicted kidnapper and murderer of women, and the justification for her sentence has not changed…KDOC has determined that the transfer of Michelle to a female facility would give rise to safety and security concerns. The Court has no reason to upset that determination).

In a sense, the placement of male pre-operative alleged trans-gender inmates in women's correctional facilities is so rare and new that there has not been a great deal of decisional law on the subject.  That is because the state and federal governments have always followed the practice of segregating the genders during incarceration for obvious safety and security reasons.  It has surely been "clearly established" for decades to house male and female inmates separately and prevent intermingling (even when confined in the same jail or prison).

It is only recently that the agitation by alleged transgender inmates has caused a re-examination of the traditional and estab-lished practice of housing inmates with others of the same gender and same genitals. This new experiment has not been without problems.[2]

---

[2] See, *Janiah v. Baldwin,* 424 F.Supp.2d 526, 533 (S.D.Ill. 2019)(noting that one transgender inmate transferred to female prison stopped taking her hormones and was sexually active; noting that the transgender women were not well received; that many incarcerated women have been exposed to domestic, physical, or emotional violence, and transgender women sometimes scared the other women; that one transgender inmate threatened staff and other inmates; that women at the facility filed complaints against the transgender inmate under the Prison Rape Elimination Act, and that many were legitimate complaints; and that the female facility eventually placed the male alleged transgender inmate in segregation for his/her own safety.

These problems are readily foreseeable and argue in favor of avoiding the placement of pre-operative male alleged transgender inmates at EMCFW.

By contrast, there is little if any decisional law in support of placing pre-operative transgender inmates in a prison with the gender with which they claim to identify.  In *Jane Doe v. Mass. Dept. of Corrections*, 2018 U.S. Dist. LEXIS 99925 (D.Mass. 2018), the district court considered the plaintiff's claims raised under the Americans With Disabilities Act (ADA). Ultimately, although not specifically contained in the court decision, information suggests that the plaintiff was evidently transferred to a women's prison despite being pre-operative.  The case of *Crosby v. Reynolds,* 763 F.Supp 666 (D. Me. 1991) resulted in the court granting qualified immunity to jail officials in a case where a pre-operative male-to-female transsexual was placed in a women's cell block in the women's wing of a jail in Maine.  The federal court acknowledged that pretrial detainees had a constitutional privacy right not to be seen naked in front of members of the opposite sex, but that the contours of the right were not clearly established in a particularized sense when dealing with the housing of a transsexual. The court ultimately did not rule on the constitutionality of housing male and female inmates in the same cell block.

Certainly, there is far greater evidence that pre-operative transgender inmates belong in prisons with inmates who possess the same genitalia.  There is no settled case law that pre-operative transgender inmates should be housed with inmates from the gender with which they claim to identify.

The third *Crowe* factor is whether the material facts are controverted.  There seems little argument that the NJDOC has transferred these inmates at EMCFW based largely, if not solely, upon their own self-identification.  There is no requirement that these alleged transgender inmates undergo thorough psychiatric exam-

7

inations, no requirement that they cross-live for a minimum of one year, no requirement they undergo hormone therapy for 6-12 months before such a transfer, no consideration of danger to the female inmate population, no preparation of the female inmate population, and no attempt to separate the male inmates from the female inmates at EMCFW for safety and security reasons. These are all uncontroverted facts alleged in the verified complaint that have occurred.

The final *Crowe* factor requires the court to assess the relative hardship to the parties.  Plaintiffs have described in their verified complaint numerous instances of problematic behavior, threats, sexual harassment, constant disruption to the prison facility, violations of plaintiffs' and class members' constitutional rights arising from the presence of the pre-operative male-to-female transgender inmates at EMCFW.  The ongoing deprivation of constitutional rights is itself a concern of public interest for it is always in the public interest that government officials comply with the constitution.  See, e.g., *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673 (1976).

Compared to this, the hardship to the defendants seems minor. They would be required to return the male alleged transgender inmates to the male prison facilities where they had previously been housed – something the NJDOC has done for decades with pre-operative male alleged transgender inmates with few problems.  If required, a special housing unit can be created in a male prison to house these inmates away from the general male prison population.  This would relieve the danger to the female inmates of being sexually and physically assaulted by the male inmates, the danger of being verbally harassed by the physically stronger male inmates, and end the discrimination against the female inmates needed to accommodate the male inmates' presence at EMCFW. The relative hardship to the parties strongly favors the plaintiffs and class members.

In a sense, this case is somewhat analogous to *Jones v. Hayman*,

418 N.J. Super. 291 (A.D. 2011), where a group of female inmates from
EMCFW were transferred to an isolated housing unit at New Jersey
State Prison (NJSP) in Trenton due to alleged overcrowding at EMCFW.
The women were dumped into a cell block, denied equal treatment with
male inmates at NJSP, and discriminated against because they were
women in a men's prison.  They filed suit, alleging:

> Because many of the women held at EMCF have experienced sexual
> and physical abuse by men prior to and in some cases during their
> incarceration they were extremely frightened by the procedures
> employed during the transfer and by the prospect of transfer to
> a men's prison. Nursing and psychiatric staff had to be called to
> attend to the panic-stricken women, and many women were medicated
> or received increased dosages of medication…Plaintiffs alleged
> equally harrowing experiences caused by the disparate conditions
> of confinement between the women at NJSP and the general population
> male inmates. The complaint alleged the imposition of restrictions
> on medical care; legal access; educational and other rehabilitative
> services; work opportunities; and exercise facilities for the
> female prisoners…According to plaintiffs, female prisoners seeking
> mental health care at NJSP were subjected to "dangerous and
> degrading conditions" in the psychiatric unit, and female prisoners
> in general were denied the ability to maintain basic cleanliness with
> respect to their bodies, clothing, and environment. In addition, the
> complaint asserted that female prisoners were subject to "routine
> exposure . . . to observation by male guards and civilian staff in
> non-emergency situations while carrying out basic bodily functions
> and while in states of nudity.  418 N.J. Super, at 298-299.

The Mercer County Superior Court judge entered an injunction to
prevent the NJDOC from any further transfers of female inmates to
NJSP during the pendency of the litigation. Using the standards of
_Crowe v. DeGioia_, the court found that that female plaintiffs first
assertions that the women confined at NJSP were "deprived of
psychiatric and medical care, items of basic hygiene, and privacy
from male guards when undressing, showering or using the toilets"
constituted irreparable harm because these allegations "add up to a
situation where the women prisoners are suffering beyond a severe
personal inconvenience." _Id_ at 301.  Next, The trial court found
that claims made under Article I, Paragraph 1 of the New Jersey
Constitution, the LAD, and the New Jersey Civil Rights Act were

9

indeed grounded on legally settled rights. *Id.*   Third, the trial court's analysis instead focused solely on whether the issuance of injunctive relief would preserve the status quo. Guided by this concern, the court concluded that enjoining defendants from continuing to transfer women inmates to NJSP "will not change the conditions of confinement at the NJSP, nor will it change the institution where Plaintiffs and other women prisoners are being confined." The court, however, made no specific findings on the question of the probability of success on the merits of plaintiffs' underlying suit. *Id.*   Finally, the court found that if an injunction were not granted, women prisoners transferred to the NJSP would be subject to the alleged inhumane and inequitable conditions present there. Furthermore, the hardship to the women prisoners there would likely become exacerbated by the increase in the number of women prisoners confined at the NJSP. However, if the injunctive relief were granted, the NJDOC would not be permitted to transfer other women prisoners to the NJSP.   The NJDOC did not argue specifically how an injunction which simply maintained the status quo would harm them.   The court found that plaintiffs had satisfied the final prong of the *Crowe* test. 418 N.J. Super. at 302.[3]

The Jones v. Hayman case is illustrative because both there and in the instant litigation, female inmates were/are being discriminated against, being subjected to unconstitutional deprivation as are alleged in their verified complaint, and were/are placed in danger of being physically and sexually assaulted by male inmates because of the presence of male inmates in the same facility.   Some women have already been physically assaulted by the male inmates and that number will surely increase the longer male inmates remain at EMCFW in general population units.

---

[3] Ultimately, the NJDOC voluntarily transferred all the women back to EMCFW in 2008. There Was no ruling by the court on the merits of the underlying complaint.

Turning to the federal court standards of Fed. R. Civ. P. 65, the moving party must first establish that it will suffer irreparable harm if the injunction is denied. The irreparable harm element requires a "clear showing of immediate irreparable injury." *Hohe v. Casey*, 868 F.2d 69, 72 (CA3 1989).  The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (CA3 2000).  It has also been described thusly: "Irreparable harm means harm such that legal remedies are rendered inadequate." *Anderson v. Davila*, 125 F.3d 148, 163, (3d Cir. 1997)

Here, the class members and plaintiffs are at risk for being physically and sexually assaulted (some have already suffered this fate), having their privacy violated by observation from male inmates while undressed, of being discriminated against while the male inmates receive preferential treatment in housing and other facets of prison life,  and other constitutional rights violations.  Monetary compensation will do little to rectify these ongoing violations.  The mental anguish and trauma that will befall these women from their distress at the hands of the male inmates adds to their surfeit of misery from sexual assault and harassment at the hands of male prison guards. [4]

Moreover, the loss of constitutional rights, even for a short time, has been held to "unquestionably constitute irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673 (1976); *Hohe v. Casey, supra,* 868 F.2d 69, 72 (CA3 1989); *Newsome v. Norris*, 888 F.2d 371, 378-79 (CA6 1989).  It is conceded that "constitut- ional harm is not necessarily synonymous with the irreparable

---

[4] A Department of Justice (DOJ) Report issued in 2020 provides a summary of the abysmal history of female inmates suffering such assaults from staff at EMCFW.  Plaintiffs ask the court to take judicial notice of that report.

11

parable harm necessary for issuance of a preliminary injunction."
*Hohe v. Casey*, 868 F.2d at 73. Nonetheless, plaintiffs have suffered
other damages as detailed in the verified complaint and supporting
certifications.  This more than meets the standard for issuance of a
preliminary injunction.

Next, the movant(s) must demonstrate a reasonable likelihood of
prevailing on the merits.  A "reasonable probability" of success does
not mean that a plaintiff must demonstrate the chance of success is
great. The plaintiff in those instances needs only to show a
**likelihood** of success on the merits (that is, a reasonable chance, or
probability, of winning) to be granted relief.  *Singer Management
Consultants v. Milgram,* 650 F.3d 223, 229 (CA3 2011).  A "likelihood"
does not mean more likely than not. *Ibid.* Because of this, a court's
finding of "reasonable probability of success on the merits" is not a
resolution of "any merit-based issue." *John T. v. Delaware County*,
318 F.3d 545, 559 (3d Cir. 2003). As the court noted in *Singer Mgmt.
Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en
banc), "We do not require at the preliminary stage a more-likely-
than-not showing of success on the merits because a likelihood of
success on the merits does not mean more likely than not."

If the movant satisfies both of these conditions, the court next
moves on to consider whether a balance of the equities does not
disfavor granting an injunction. In this case, the third factor might
be whether the male alleged transgender inmates or other persons
might suffer if the injunction were to issue.  This possibility is
small.  The male inmates were accommodated for years in the male
prisons with little discernable harm.  Moreover, they could easily be
housed in a dedicated unit in the male prison with no contact with
other male inmates if they so desire for their own safety. As to the
NJDOC, that entity is actually suffering more from the presence of
the male inmates at EMCFW than it would from the return of the male
inmates to appropriate male prisons.

Finally, the court weighs the issue of whether granting the injunction is in the public interest. That is, do public interest concerns outweigh the interests advanced by issuing the injunction. It must be noted first that it is always in the public interest for state governmental officials to obey the law and respect constitutional rights of prison inmates. See, e.g., Playboy Enterprises Inc. v. Meese, 639 F. Supp. 581, 587 (D. D.C. 1986)(stating "it is in the public interest to uphold a constitutionally guaranteed right").

Entry of the injunction sought by the plaintiffs would not harm the public interest since the public is not affected by classification decisions made inside the prison system.

In sum, the plaintiffs and class members seem to meet the requirements for entry of a preliminary injunction to require the NJKDOC to remove the male alleged transgender inmates from housing units at EMCFW in which female inmates are housed.

CONCLUSION

For the foregoing reasons, this Court should grant the motion of the plaintiffs and enter a preliminary injunction to require the NJDOC to remove all inmates with male genitalia from any housing unit at EMCFW in which women are housed, and to place the inmates with male genitalia in male prisons.

Dated: November 30th, 2021

Jennifer Pasquarello, Plaintiff

Michelle Angelina, Plaintiff

13

Jennifer Pasquarello, Pro Se Plaintiff
Michelle Angalina, Pro Se Plaintiff
Edna Mahan Correctional Facility
30 County Rt. 513
Clinton, N.J., 08809

**UNITED STATES DISTRICT COURT**
For the District of New Jersey
Vicinage of Trenton

------------------------------------

JENNIFER PASQUARELLO, :
MICHELLE ANGELINA, :
On Behalf of Themselves and All :
Other Similarly Situated Women, : CIVIL ACTION NUMBER: 3:21-cv-18806 (ZNQ)
     Pro Se PLAINTIFFS :
              : STATE COURT DOCKET: HNT-L-000273-21
     vs. :
              :
PHIL MURPHY, MARCUS HICKS/ : **CERTIFICATION OF MICHELLE ANGELINA**
Ms. KUHN, AL KANDELL, :
PATRICIA McGILL, DEMETRIUS :
MINOR, CARLOS MARTINEZ, :
     DEFENDANTS :

     I, Michelle Angelina, being duly sworn, do hereby appear and state:

    **(1)** I am one of the two pro se plaintiffs in this proposed class action litigation, and make this certification to set facts forth before the court related to this action.

    **(2)** I have observed Edna Mahan Correctional Facility (EMCF) inmates Tatiana Harrison and Demetrius Minor engaged in acts of heterosexual intercourse in the North Hall housing unit.

    **(3)** On the evening of April 2, 2021, at a time of 6:00 PM to 6:30 PM, I personally observed inmates Demetrius Minor and Tatiana Harrison engaged in heterosexual intercourse in the North Hall, South Wing day room. The two inmates were lying on the floor, with Minor on top of Harrison and with Minor's penis entering Harrison's vagina. I then observed Inmate Minor

withdraw his penis from Inmate Harrison's vagina and ejaculate on the stomach of Inmate Harrison.

**(4)** On two other unrelated occasions, I observed Inmate Harrison performing fellatio upon Inmate Minor in the same location. One of these incidents occurred on April 20, 2021.

**(5)** I reported these incidents of sexual activity and others to custody supervisor Lt. Seifert at EMCF and he assured me that he would investigate the matter. No Prison Rape Elimination Act (PREA) protocols were ever initiated and Inmates Minor and Harrison were not separate from each other and placed in separate housing units.

**(6)** I also witnessed male alleged transgender inmate Jermaine Gibson perform an act of fellatio upon Inmate Demetrius Minor in the North Hall, South Wing day room area. I observed Inmate Minor's penis inside the mouth of Inmate Gibson. Their sexual activity was interrupted and I am unaware whether they resumed their sexual activity after the interruption.

**(7)** I have also witnessed threats to do physical harm voiced by Inmates Demetrius Minor and Carlos Martinez upon both myself and Inmate Jennifer Pasquarello. On the evening of May 7, 2021, Inmate Demetrius Minor entered the North Hall, East Wing day room and approached the table where Inmate Pasquarello and I were seated. Minor stated in a loud voice that I had gone to an officer and accused Inmate Minor of harassing me. Inmate Minor then began to threaten to "beat the shit out of" myself and Inmate Pasquarello. Minor then stated that "you're not on the same wing as me and Jen so you can't be there to protect Jen from me, so I'll just beat your friend to death, like you beat that bitch to death that you're in prison for killing."

**(8)** This verbal threat by Inmate Minor resulted in my suffering great anxiety, elevated blood pressure, loss of appetite and sleeplessness because of the effect upon my mental state.

**(9)** I also witnessed Inmate Carlos Martinez threaten my friend Jennifer Pasquarello while Inmate Pasquarello and I were walking back to our assigned housing unit (North Hall) from the EMCF hospital medication movement. On the date of April 23, 2021, Inmate Martinez threatened to "beat the shit out of" Ms. Pasquarello.

**(10)** The above incidents are only a sample of the constant, ongoing

verbal threats, harassment and intimidation tactics used by male alleged transgender inmates Demetrius Minor and Carlos Martinez.  There are other, less serious incidents which did not result in as serious harm to myself, but which are indicative of bullying, intimidation and harassing behavior by these two inmates.

(11) The factual allegations set forth in the verified complaint are true and correct to the best of my knowledge and I incorporate those allegations by reference into this certification. I request that the Court accept those factual allegations as if set forth separately in this certification.

(12) In addition to the factual allegations set forth in the verified complaint and above in this certification, the following incidents have also occurred.

(13) Inmate Demetrius Minor has made anti-Semitic comments to me on several occasions and has also used language that is derogatory to my status as a post-operative transgender woman.  Minor used the phrase "slice-dick bitch" to describe me.

(14) On the date of August 31, 2021, male alleged transgender inmate R.R. caused a serious disturbance in the South Hall unit at EMCF, requiring custody staff to respond, shutting down all movements for more than nine hours and causing the female inmates to be unable to participate in their regular movements and activities.

(15) On the date of September 1, 2021, male alleged transgender inmate R.R. engaged in a violent fight with a female inmate in the South Hall unit, resulting in a prison-wide shutdown and requiring a correctional staff response that endangered the safety of staff and female inmates, as well as injuries to the female inmate with whom R.R. was fighting.

(16) On the date of September 10, 2021, male alleged transgender inmate Q.G. seriously assaulted a staff member at EMCFW, inflicting injuries which resulted in bleeding, and causing a lockdown of the facility for an extended time while custody staff responded to the emergency.

(17) Later on the date of September 10, 2021, male alleged transgender inmate C.M. was involved in a physical altercation with a female inmate, causing a lockdown of the prison while custody staff responded to the emergency.

(18) On the date of October 6, 2021, Inmate Demetrius Minor, with whom I

have a 'keep separate" custody status, deliberately lied about me,
complaining to administration that I had made a derogatory comment about
transgender inmates while walking near the South Hall unit where Minor is
housed.  This is the latest episode in a continuing pattern of verbal abuse
and harassment directed at me by Inmate Minor.

**(19)** On or about the date of October 12, 2021, I received via institut-
ional mail a document from defendant Demetrius Minor captioned "Motion to
Dismiss Complaint for Lack of Jurisdiction and Frivolous Litigation," along
with what appears to have been a certification in support. The document
contained numerous insulting and derogatory remarks about myself and set
forth legal arguments and irrelevant facts that would not be admissible in a
trial proceeding. The documents were dated August 19 and 20, 2021 and
postmarked August 24, 2021, although the envelope appears to have been
tampered with, i.e., cut open, sealed and reused.

**(20)** I contacted the Civil Division Manager of the Hunterdon County
Superior Court on the date of October 21, 2021, to inquire whether any such
motion had been filed with the court by defendant Minor.  I was advised that
no such motion had been filed. That defendant Minor would send me a
falsified document which was never filed with the court, in a deliberate
attempt to inflict more emotional distress and the perpetration of a fraud
upon myself and the legal process,  indicates how this defendant has acted
throughout Minor's confinement at EMCFW. The "Notice of Motion to Dismiss"
(filed without an accompanying motion to vacate the default that exists
against this defendant) is little more than a personal attack against me,
full of insults and false statements, and does not even address the
allegations set forth in the complaint.

**(21)** Defendants Minor and Carlos Martinez are in default and have taken
no action to either file a motion to vacate any default or to respond to
legitimate and legal discovery requests (Interrogatories and Requests for
Documents) served upon Minor and Martinez by the plaintiffs in late August
2021.  Instead, Minor complained to EMCFW administration and custody
personnel that Minor was under no obligation to accept service of any
documents not mailed by the court or by an attorney to Minor. I was then
approached by custody supervisors and questioned about my sending discovery
requests to defendants Minor and Martinez. As of October 25, 2021, no

response has been received by the plaintiffs from either of these defendants to either the complaint or the discovery requests.

**(22)** I have been affected emotionally by the verbal abuse and threats. I have suffered through sleepless nights, have been irritated and had trouble concentrating, have had digestive problems and loss of appetite, and have on several occasions been required by prison officials to go to the hospital building for a body assessment and the enactment of so-called "PREA protocols" because of lying allegations made by Inmate Minor. The problem seems to be worsening.

**(23)** On the morning of November 29, 2021, while I was walking on the Max-Medium Compound at EMCFW, defendant Minor made another threatening comment to me while I passed the South Hall building where Minor is assigned.  Minor picked up a fist-sized rock from the ground and called out to me "this has your name on it."  The implied threat was that Minor was thinking of stoning me.  I was emotionally distraught and crying for hours after this implied threat. This is the latest in a long list of threats and harassing taunts made by defendant Minor against me.

**(24)** Inmate Minor is assigned to the South Hall housing unit, which is where the Maximum/Medium unit law library is located and I need to visit that law library to perform my legal work and research.  I do not wish to have problems with Minor during those visits. Minor has exhibited a pattern of walking around EMCFW without authorization and without any repercussions from custody staff, and I am concerned that Minor may enter the library in South Hall while I am present to provoke more incidents and issue more threats.

**(25)** The behavior of the male alleged transgender inmates has created an atmosphere of fear and apprehension among many of the female inmates at EMCFW to whom I have spoken, including myself and Inmate Pasquarello.  Some inmates have requested transfers to other states because of their apprehension. Some female inmates have spoken about the possibility and hope of intentionally being impregnated by one of the male inmates in the hope of gaining a large lawsuit award and an early release from prison ("make a million dollar baby").  The

common thread among the concerns is the fear that what is supposed to be a women's prison is becoming a male facility.

**(26)** During my appointments to do research in the South Hall law library, I did research on the very same computer (a computer for use by general population), I discovered that there was a password protected file of Inmate Minor in the memory.  On the date of November 30, 2021, I discovered a personal letter written by Inmate Minor.

**(27)** I have been affected emotionally by the verbal abuse and threats from Inmates Minor and Martinez. I have suffered through sleepless nights, have been irritated and had trouble concentrating, have experienced digestive problems and loss of appetite, and have on several occasions been required by prison officials to go to the hospital building for a body assessment and the enactment of so-called "PREA protocols" because of these incidents and contrived and false accusations made by Inmates Minor and Martinez.

**(28)** On the date of November 24, 2021, female inmates were advised by the unit Inmate Liaison that there was a possibility that they might have to sit through mandatory "gender sensitivity training" classes because of reported incidents of "misgendering" of the male alleged transgender inmates by female inmates at EMCF.  I and other women objected to the mandatory nature of such classes because forced attendance would be a substantial burden on our right to practice our religion without a compelling need under the Religious Land Use & Institutionalized Persons Act (RLUIPA), Title 42 U.S.C. Section 2000cc.  Such forced attendance may also violate our right to free speech and the free exercise of religion under the U.S. and New Jersey Constitutions.

**(29)** Many women at EMCFW hold religious beliefs that persons who possess male genitalia are to be called by male pronouns and those with female genitalia called by female pronouns.  These include Muslim inmates, fundamentalist Christian inmates, and Jewish inmates.

I also believe that many of the male alleged transgender inmates are insincere in their professed "female identities" and are trying to manipulate the NJDOC.

(30) Removing the male alleged transgender inmates from EMCFW would solve this problem completely and this is another reason for this court to enter such injunctive relief.

CERTIFICATION

Pursuant to 28 U.S.C. Section 1746(2)

I declare under penalty of perjury that the foregoing is true and correct.

Dated: __December 1__ , 2021

Michelle Angelina, Pro Se

Jennifer Pasquarello, Pro Se
# 558110E
Edna Mahan Correctional Facility
30 County Route 513
Clinton, N.J., 08809

## UNITED STATES DISTRICT COURT
For the District of New Jersey
Vicinage of Trenton

---

| | |
|---|---|
| JENNIFER PASQUARELLO,<br>MICHELLE ANGELINA,<br>On Behalf of Themselves and All<br>Other Similarly Situated Women,<br>Pro Se PLAINTIFFS | :<br>:<br>:<br>: CIVIL ACTION NUMBER: 3:21-cv-18806 (ZNQ)<br>: |
| vs. | : STATE COURT DOCKET: HNT-L-000273-21 |
| PHIL MURPHY, MARCUS HICKS/<br>Ms. KUHN, AL KANDELL,<br>PATRICIA McGILL, DEMETRIUS<br>MINOR, CARLOS MARTINEZ,<br>DEFENDANTS | :<br>:<br>: **CERTIFICATION OF JENNIFER PASQUARELLO**<br>:<br>: |

The undersigned deponent, Jennifer Pasquarello, being of full age, does appear and state in lieu of formal oath the following:

**(1)** I am one of the *pro se* plaintiffs in this civil action, and make this certification to bring the following facts before the court.

**(2)** On the date of Thursday, April 22, 2021, at 12:15-12:30 PM, while returning from the Edna Mahan Correctional Facility hospital medication call, I was verbally threatened multiple times by Inmate Carlos Martinez. Inmate Martinez threatened to "beat the shit out of" myself in front of at least two witnesses, one of whom was staff member Ms. Scott.

**(3)** Inmate Martinez apparently did this because I had asked Martinez to stop interrupting my conversation with Inmates Eileen Leone and Debra Aquilina.

**(4)**   Inmate Martinez was also calling my friend Michelle Angelina names and
I asked Martinez to keep negative comments to herself.

**(5)**   When I entered the North Hall unit (my assigned unit), Inmate Martinez
again threatened me by saying "I'll fuck you up" to me in front of witnesses
which included one corrections officer.  This officer, who I presume
witnessed the incident, declined to write a disciplinary charge and ordered
Inmate Martinez to go to Martinez' assigned wing.

**(6)** In December 2020, on several occasions, while I was assigned to a Cell
on the South Wing of the North Hall housing unit, I was approached by one of
the male-to-female transgender inmates named William Baberick and Baberick
invited me to join Baberick in the wing shower.  On one occasion, Baberick
stopped me on my way to the wing shower by calling my name as I walked past
Baberick's cell.  I observed Baberick completely nude inside the cell, with
erect male genitals readily visible.  Inmate Baberick said to me "Hey Jen,
like what you see, you want to fuck?" I turned away and proceeded to the
shower where I silently cried in shock and anguish at what I had witnessed.

**(7)** In late March 2021 and early April 2021, on several occasions, I
witnessed male-to-female transgender inmate Demetrius Minor enter the cell
of another male-to-female transgender inmate named Jermaine Gibson.  I heard
moaning coming from inside the cell.  I was assigned to the cell right next
to Gibson's cell and could hear the sounds of sexual activity through the
walls/air vents.

**(8)** On March 28, 2021, at the time of approximately 6:40 PM, I witnessed
female inmate T.H. leaving from the cell assigned to male-to-female
transgender inmate Demetrius Minor on South Wing in the North Hall unit.  I
later observed the same two inmates enter a wing hopper closet (which
contains cleaning equipment) together.

**(9)** On several occasions I have witnessed inmate Demetrius Minor wander
around the EMCFW maximum/medium security compound without being challenged
or questioned by corrections officers as to where this inmate was supposed
to be  or why this inmate was walking around.  I have seen female inmates
who engage in such behavior suffer disciplinary action for engaging in this
kind of activity.

**(10)** On multiple occasions I have witnessed Inmates Demetrius Minor and
another male-to-female transgender inmate Carlos Martinez physically attempt

to intimidate cisgender women at EMCFW.  On one occasion, Minor banged on a
wall in the vicinity of a female inmate who suffers from severe post-
traumatic stress disorder (PTSD).  Inmate Minor is and was aware that this
inmate is easily frightened and that loud noises trigger the inmate's PTSD.

**(11)** I have witnessed and reported to the Special Investigations Division
(SID) an incident in which male-to-female transgender inmates Demetrius
Minor and Jermaine Gibson were engaging in the act of fellatio, with Gibson
performing that act upon Inmate Minor in the North Hall, South Wing day room
floor near the dayroom divider window.  These events occurred in late April
or early May of 2021.

**(12)** On the date of April 27, 2021, I reported to mental health staff member
Dr. Reed during a therapy session (in which I was expressing my feelings
about the inequality of discipline between the female inmates and the male-
to-female transgender inmates), that I had observed inmates Demetrius Minor
and female inmate T.H. kissing in the North Hall, South Wing day room, an
incident which was witnessed by custody staff prison officials.  This
comment by myself resulted in Dr. Reed notifying administration, which
resulted in the initiation of the Prison Rape Elimination Act (PREA)
protocol being enacted insofar as Inmates Minor and T.H. were concerned.  As
a result of the PREA protocol, I suffered retaliatory actions from inmates
Minor, Martinez and female inmate T.H.

**(13)** On Wednesday, May 12, 2021, inmates Minor, Martinez and female inmate
T.H. entered the North Hall, East Wing dayroom area, proceeded to sit down
at a table where I and Inmate Michelle Angelina were seated, and began to
verbally harass and threaten both myself and Inmate Angelina.  It is my
opinion that their actions were undertaken in an attempt to provoke a
physical altercation.  Minor, Martinez and T.H. made comments about the
crime of conviction for which I am serving a sentence, my son who is gay, my
own physical appearance, my own level of intelligence and about Inmate
Angelina's gender dysphoria.  At one point, I observed Inmate Minor grab a
pair of eyeglasses belonging to Inmate Angelina and break a lens on those
eyeglasses.

**(14)** I reported this behavior to the North Hall unit officers and also to
Sgt. R. Anema.  I was told that I would be placed on special segregation
status if I wished to pursue remedies for the incident (which was visible on

camera). I had been harassed and threatened by three inmates and the prison's response would have been to segregate me and not the perpetrators.

**(15)** During the week of May 13 and 14, 2021, I met with mental health staff member Dr. Rafelson in reference to a PREA investigation. I expressed to Dr. Rafelson my dissatisfaction at how my reports of harassment and bullying By these three inmates were being handled by prison officials. I also reported escalations in the patterns of aggression exhibited by these three inmates toward myself and Inmate Angelina.

**(16)** In late November 2020, while living on South Wing in the North Hall unit, I witnessed Inmate Demetrius Minor and female inmate L.B. in the laundry room/kitchen area of the North Hall, South Wing unit, kissing and fondling each other. I am not the only person who has seen and/or reported such behavior. Similar conduct by Minor and L.B. was brought to the attention of custody staff by multiple other inmates and was investigated by the S.I.D. investigators, who determined that such reports constituted "inconclusive" evidence of sexual activity. Inmate L.B. was required by prison officials to take a pregnancy test as part of the investigation.

**(17)** Both Inmate Minor and Inmate L.B. are presently assigned to the same housing unit in South Hall. They are permitted to live on the same wing despite their egregious sexual conduct in North Hall.

**(18)** The factual allegations set forth in the verified complaint are true and correct to the best of my knowledge, and I incorporate those factual allegations by reference into this certification. I request that this court accept those factual allegations as if set forth separately in this certification.

**(19)** In addition to the factual allegations set forth in the verified complaint and above in this certification, the following incidents have also occurred.

**(20)** On the date of August 31, 2021, male alleged transgender inmate R.R. caused a serious disturbance in the South Hall unit, resulting in a prison-wide shut-down and requiring custody staff to respond, shutting down all inmate movements for more than nine hours and preventing the female inmates from engaging in their regular activities and movements.

**(21)** On the date of September 1, 2021, male alleged transgender inmate R.R. engaged in a violent fight with a female inmate in the South Hall unit,

resulting in a prison-wide shutdown and requiring a correctional staff
response that endangered the safety of staff and female inmates.

**(22)** On the date of September 10, 2021, male alleged transgender inmate Q.G.
seriously assaulted a staff member at EMCFW, inflicting injuries which
resulted in bleeding, and causing a lockdown of the facility for an extended
time while custody staff responded to the emergency.

**(23)** Later on the same evening of September 10, 2021, male alleged
transgender inmate C.M. was involved in a physical altercation with a female
inmate, causing a lockdown of the prison while custody staff responded to
the emergency.

**(24)** The behavior of the male alleged transgender inmates has created an
atmosphere of fear and apprehension among many of the female inmates at
EMCFW to whom I have spoken, including myself and Inmate Angelina.  Some
inmates have requested transfers to other states because of their
apprehension. Some female inmates have spoken about the possibility of
intentionally being impregnated by the male inmates in the hope of gaining a
large lawsuit award and an early release from prison. The common thread
among the concerns is the fear that what is supposed to be a women's prison
is becoming a male facility.

**(25)** I have been affected emotionally by the verbal abuse and threats from
Inmates Martinez and Minor.  I have suffered through sleepless nights, have
been irritated and had trouble concentrating, have experienced digestive
problems and loss of appetite, and have on several occasions been required
by prison officials to go to the hospital building for a body assessment and
the enactment of so-called "PREA protocols" because of these incidents and
deceitful and false accusations made by Inmates Minor and Martinez.


CERTIFICATION
Pursuant to 28 U.S.C. Section 1746(2)
I declare under penalty of perjury that the foregoing is true and
correct.

Dated: _×ₙ Sovember 2_ 2021          × _Jennifer Pasquarello_
                                     Jennifer Pasquarello, Pro Se

Leslie Nelson, # 403427B
Edna Mahan Correctional Facility
30 County Rt. 513
Clinton, N.J., 08809

**UNITED STATES DISTRICT COURT**
For the District of New Jersey
Vicinage of Trenton

------------------------------------

-----------------------------------------------------

JENNIFER PASQUARELLO,       :
MICHELLE ANGELINA,          :
On Behalf of Themselves and All :
Other Similarly Situated Women, :   CIVIL ACTION NUMBER: 3:21-cv-18806 (ZNQ)
    Pro Se PLAINTIFFS      :
                     :   STATE COURT DOCKET: HNT-L-000273-21
                     :
         vs.           :
                     :
PHIL MURPHY, MARCUS HICKS/   :
Ms. KUHN, AL KANDELL,        :   **CERTIFICATION OF LESLIE NELSON**
PATRICIA McGILL, DEMETRIUS   :
MINOR, CARLOS MARTINEZ,      :
    DEFENDANTS          :

    I, Leslie Nelson, being duly sworn, do hereby appear and state:

   **(1)** I am presently confined at the Edna Mahan Correctional Facility in Clinton, N.J., ("EMCFW") and have been incarcerated at NJDOC facilities since 1997.

   **(2)** I was present at EMCFW when the pre-operative male-to-female alleged transgender inmates arrived and I have personally observed obnoxious, threatening and intimidating behavior by the male inmates toward the women at EMCFW. Most of this behavior was perpetrated by male inmates Raequan Rollins, Carlos Martinez, Harry Wilkins, and Quagee Gibbons, although others have also occasionally acted out.

   **(3)** Inmate Demetrius Minor, although less overtly intimidating and threatening than the above-named individuals, has engaged in covert invidious attempts to undermine normal operating procedures, falsely

accuse other inmates and staff of improper and inappropriate conduct for Minor's own benefit, and to selfishly do whatever underhanded behavior Minor can in order to advance Minor's own agenda.

**(4)** I personally observed Inmate Demetrius Minor kissing female inmate T.H. on the cheek in the North Hall gymnasium during a North Hall unit indoor recreation period not long after the male inmates arrived at EMCFW. This incident occurred in September 2020, while I was walking in the gymnasium for exercise.

**(5)** I also personally observed during a different North Hall gymnasium recreation period at a later date, which I believe was in late October or early November 2020, that male inmate Demetrius Minor was holding the feet of female inmate T.H. while T.H. was lying down and engaged in attempting to do sit-up or leg exercises.  The physical contact is a direct violation of NJDOC disciplinary code NJAC 10A:4-4.1(a) .013 – unauthorized physical contact.  This happened on several different days in different exercise periods.

**(6)** I observed on one occasion, a corrections officer order Inmate Minor to leave the gymnasium and not return, for reasons not told to me but which I believe were related to the physical contact between Minor and T.H.

**(7)** I have also observed physical contact between male alleged transgender inmate William Baberick and a female inmate of a similar nature while walking in the gymnasium for exercise.

**(8)** In November 2020, I was summoned to the prison hospital at EMCFW because of some undisclosed complaint or grievance that I found out was written on the J-Pay kiosk by Inmate Demetrius Minor.  I was offered an opportunity to accept or refuse protective custody status. The exact nature of this complaint was never disclosed to me. I found out only much later that Inmate Minor had lodged a complaint on the J-Pay kiosk in which Minor accused me of circulating a "petition" to have the male alleged transgender inmates removed from EMCFW. This was completely false; there was no such petition.  I have tried to

avoid any contact with Inmate Minor and the other male alleged
transgender inmates.

   **(9)** I am a post-operative transsexual myself, having undergone the
Gender reassignment surgery (GRS) long <u>before</u> my incarceration ever
occurred, so that I do not fall under the poorly-conceived and
nebulous NJDOC policy standards and directives for care of
transgender inmates.  I know about the World Professional Association
for Transgender Health, (WPATH) Standards of Care for The Health of
Transsexual, Transgender, & Gender Nonconforming People. I am also
familiar with previous treatment standards (the Harry Benjamin
standards) for transgender individuals, since I personally was
treated under the standards preceding the WPATH standards. I know
that reputable surgeons require at least two psychological
evaluations for any prospective candidate for gender reassignment
surgery (GRS), one of which must be from a licensed <u>psychiatrist</u>,
attesting to mental condition.  This is done to weed out
psychologically inappropriate candidates for the surgery such as
frivolous or manipulative requestors as well as persons who might be
psychotic or suffer some other serious mental illness. In addition,
ongoing psychological counseling is generally advised or required for
prospective GRS candidates during the transition process, along with
hormonal therapy and cross-living in the desired gender role.  The
last requirement is problematic in the prison environment since
inmates will not encounter the same situations (such as finding
employment, public bathroom use, finding housing, and many other
problems) which are found in the community.

   **(10)**    I have no knowledge that any of the male alleged
transgender inmates transferred to EMCFW have undergone these
psychological evaluations and diagnoses prior to being brought to
this facility. The NJDOC does not employ mental health professionals
who specialize in gender dysphoria and I have never, in more than two
decades of incarceration, encountered a mental professional with

experience in treating transsexual patients. As a result, I am other
inmates at EMCFW believe that many (although not all) of the alleged
transgender inmates are malingering and pretending to be transgender
merely to manipulate NJDOC into transferring them to a prison
perceived to be "easier" or where they can pursue heterosexual
relationships with women.

**(11)** I believe it is highly inappropriate for the NJDOC to place
pre-operative male-to-female allegedly transgender inmates in a
women's prison. I have observed many of these recently transferred
inmates and seen them behaving in a masculine manner, speaking with
masculine voices, trying to pursue romantic relationships with female
inmates, acting in a violent and aggressive manner, and threatening
the safety of inmates and staff at EMCFW.

**(12)** In particular, Inmate William Baberick repeatedly made
sexual advances toward female inmates at EMCFW, and on one occasion
asked a female inmate to marry him.

**(13)** Several of the male inmates, Quagee Gibbons, Raequan
Rollins and Zachary Hoger, have been violent and difficult to
control. Gibbons on one occasion attacked a corrections officer and
injured that staff member, and has also started fires using batteries
and toilet paper. Hoger flung a television while in the RHU
recreation module and engaged in self-mutilating behavior on other
occasions. Rollins has also threatened others with violence and made
derogatory comments to myself from a window in the South Hall unit.
There have been numerous codes called resulting from the behavior of
these three inmates, resulting in EMCFW being shut down for extended
periods of time while staff responds to the emergency. All three
inmates claim to identify as women, yet act, look, speak, and behave
as men do.

**(14)** I personally observed Inmate Demetrius Minor engaged in
manipulative and dishonest behavior such as lying about other inmates
and staff, walking around the EMCFW maximum/medium compound without

being challenged by custody staff as to why Minor was not in the
assigned housing unit for this inmate.  Minor has filed complaints
against staff and other inmates under the Prison Rape Elimination Act
(PREA) that have resulted in several staff members whom Minor
believed were hostile to Minor being transferred even though the
allegations were contrived, and has used those regulations as a
weapon despite the fact that PREA has been held by numerous federal
courts not to create any individually enforceable rights.

(15)   Minor has also tried to use the New Jersey Law Against
Discrimination (NJLAD) language which forbids discrimination against
certain classes of individuals as a weapon to attain his own ends.
For example, Minor is trying to get classified to the Stowe dormitory
style housing unit by complaining that the EMCFW administration's
failure to do so violates NJLAD.  Moreover, this statute also
prevents discrimination against women and post-operative transgender
persons – something which is being disregarded due to the prefer-
ential treatment accorded to the pre-operative male alleged
transgender inmates.

(16)   Inmate Minor has also managed to attain an unprecedented
classification as a "paralegal intern – volunteer" part-time job in
the EMCFW law library despite the fact that no such job position
existed prior to Minor's assignment, despite the fact that Minor was
already assigned to a job as a paint detail worker, and despite the
fact that Minor's placement in that job was in violation of several
of the regulations in the NJAC for selecting inmate paralegals. I
have annexed as Exhibit A hereto a copy of a grievance/complaint
letter that I have sent to various NJDOC officials which specifies
the exact nature of my own complaints against Inmate Minor

(17)   I have also had trouble of my own with several of the male
alleged transgender inmates.  One of the inmates named Harry Wilkins,
repeatedly called me "an old bitch" from a distance but never when I
was in close proximity.  Another of those inmates, Raequan Rollins

threatened to spit in my face from the window of Rollins' cell and on another occasion told me "the only difference between you and me is that you got your d*** cut off before you were locked up."  I also had problems with a third male inmate named Desjonte Would, violating my privacy by peeking in the window of my cell while I was partially undressed and changing my clothes.

(18)    I have observed the male alleged transgender inmates being given special clothing not made available to female inmates such as padded brassieres and thongs to try and keep their male genitalia from bulging and jiggling inside their trousers.

(19)    I have observed female inmates being repeatedly moved from the units (North Hall and now South Hall) where the pre-operative male-to-female alleged transgender inmates are housed when a problem arises between the female inmate and one of the male inmates.  The women are placed in cramped, dormitory-style housing while the male inmates remain in single-cell housing units North Hall and South Hall. This alone is discriminatory toward the female inmates.

(20)    I am aware of at least two female-to-male alleged trans-gender inmates who are confined at EMCFW despite the fact that the NJDOC has a professed policy of housing inmates according to gender identity rather than physical anatomy. Many women at EMCFW have asked if the NJDOC sees fit to place male inmates to EMCFW merely based on the inmate's own unsubstantiated claim of "identifying" as women, why does the NJDOC not place the female-to-male inmates in men's prisons because they claim to identify as men?

(21)    I am aware of at least two occasions in which a male alleged transgender inmate physically assaulted a female inmate at EMCFW.  In November 2020, Inmate Raequan Rollins was involved in a physical altercation with two women in the North Hall day room and in September 2021, a female inmate confined in the RHU unit was involved in a physical altercation with the same male inmate in the RHU recreation module.

(22)    As a post-operative transgender person myself, it is my opinion that the NJDOC policy of simply accepting the unsubstantiated claims of male inmates that they "identify" as women without thorough psychiatric screening and a history of cross-living prior to incarceration is very questionable, exposes the female inmates at EMCFW to physical and sexual assault, violation of their privacy, and discriminatory treatment because of the preferential treatment given to the pre-operative male-to-female transgender inmates.

(23) Many of the female inmates at EMCFW have a history of having been physically and/or sexually abused by men. There have been repeated instances of male staff members of EMCFW engaging in sexual abuse of female inmates.  Now the NJDOC sees fit to place male inmates who are convicted felons in their same prison with potential victims of sexual and physical assault.

(24) The behavior of the male alleged transgender inmates has created an atmosphere of fear and apprehension among many of the female inmates at EMCFW to whom I have spoken, including myself and Inmate Angelina.  Some inmates have requested transfers to other states because of their apprehension. Some female inmates have spoken about the possibility of intentionally being impregnated by the male inmates in the hope of gaining a large lawsuit award and an early release from prison ("make a million dollar baby").  The common thread among the concerns is the fear that what is supposed to be a women's prison is becoming a male facility.

CERTIFICATION
Pursuant to 28 U.S.C. Section 1746(2)
    I declare under penalty of perjury that the foregoing is true and correct.

Dated: ___11/24___ , 2021          _Leslie Nelson_____
                                           Leslie Nelson

Leslie Nelson - # 403427B
Edna Mahan Correctional Facility
30 County Route 513
Clinton, N.J., 08809
November 23, 2021

TO: Ms. Erica Stem, Acting Administrator
    Edna Mahan Correctional Facility
    30 County Route 513
    Clinton, N.J. 08809

Dear Ms. Stem:

    I am writing this letter to you in order to bring certain facts to your attention and request assistance from your office for a problem that is consistently occurring at the Edna Mahan Correctional Facility. I am an inmate confined at that facility and I have worked as a prison paralegal since 2009. The problem concerns the presence of Inmate Demetrius Minor in the ILA office during the daytime scheduled working hours of the ILA inmate workers. As of Tuesday, October 26, 2021, Inmate Minor appeared in the ILA office at 8:00 AM and remained in the office through the 11:00 AM inmate count, left the office at 12:00 noon, returned at 1:30 PM, and was still in the office at 3:30 PM when the ILA workers left for the day. On Wednesday, October 27, 2021, Minor appeared in the office again in the early afternoon and was in and out for the remainder of the afternoon. This trend continued in week of November 1-5, 2021. This is significant and troublesome because the following things must be noted:

- Inmate Minor is NOT a certified paralegal at EMCFW; Minor is allegedly classified as a "paralegal intern" with Minor's own specific work hours separate and apart from the ILA paralegals. Minor was classified to that "job assignment" despite being **at the same time** classified as a paint detail (and later a South Hall detail) worker and **getting paid** for the latter jobs. There is no provision in any part of the NJAC 10A:6-2.12 (inmate paralegals) for the assignment of an inmate as an "intern paralegal" worker. There is no provision for an inmate to be classified to two different jobs at the same time. Minor cites a non-existent NJAC 10A:6-2.18(d) to justify an argument that the supervisor of education can "deem" that an inmate with experience and knowledge can serve as a paralegal, but there is no such section in the code. Moreover, under NJAC 10A:6-2.14(a), "only inmates designated as paralegals: 1. Will be granted access to Close Custody Units; and 2. May act as a counsel substitute at disciplinary and other correctional facility hearings."
- Minor's presence in the ILA office during daytime hours is interfering with the operation Of the office for the following reasons:

    (1) The inmate population coming in for research cannot use the computers for research because Minor is monopolizing one of them when present in the office;
    (2) Minor's presence is severely impairing communication between the ILA paralegals and the inmates who come for assistance. With Minor in the office to overhear conversations, there is no confidential communications. Inmates from population are reluctant to discuss their legal issues in front of Minor. The ILA paralegals have had to travel to the units where The inmates scheduled for appoints reside in order to conduct interviews because of Minor's presence in the ILA office.
    (3) Inmate Minor's presence at the desk that Minor somehow attained and appropriated prevents proper social distancing during the era of COVID-19 pandemic because the inmates who do utilize the population research computers are closer than ten feet to Minor. To add to the problem, Inmate Minor (and the population inmates that enter) often do not wear masks.

①

coming from but this is a total lie) and alleging that Minor worked in the law library in NJSP and was a member of the ILA in NJSP and/or SWSP, and that Minor knows how to draft "all kinds of legal pleadings." Minor further claims that I personally have changed/installed passwords on computers in the office (this was done by education staff members, not by inmates), that I considered myself to be "in charge" of the ILA office (this is nonsense, I never made such a claim). The implication is that the ILA paralegals do not know how to do these things. This is slanderous nonsense. I have seen some of Inmate Minor's legal work, filed with the court as part of an ongoing civil rights lawsuit by EMCFW inmates, and it is rife with misspellings, errors in grammar and syntax, poor formatting, and drafting errors. This personal disparagement completely misrepresents the abilities and work product of the ILA paralegals. In a sense, Inmate Minor is using the same tactics of lies and fabrications that were used as a basis (at least in part) to have EMCFW Education Director Thatcher transferred from EMCFW. The new goal is to evidently oust the ILA paralegals who have provided excellent and competent service to the EMCFW max-medium inmate population for years.

- Inmate Minor brags about assisting EMCFW inmates with their legal problems at EMCFW, but in fact this inmate is scheduling a small group of inmates (such as Lockwood, Nobles, Bellamy, etc.) for repeated appointments over and over again. In so doing, Minor has failed to provide adequate assistance to the Reception inmate population. I have already mentioned that I had to correct mistakes made by Minor in the job function of a "volunteer intern paralegal."

- Minor complains about the allegedly "poor condition" of the EMCFW max law library, the absence of books and forms, etc., but fails to mention that the books that are not present were in fact present from 1998-2004 before being removed at the same time that EMCFW transitioned to the Lexis/Nexus database. This computer database contains the same information that was formerly contained in hundreds of books. I was present at EMCFW when this transition occurred. The forms are contained in the file cabinets and on the paralegals' computers for ease and speed of completion. Minor does not know this, but assumes that the lack of books and forms points to the alleged "incompetence" of the ILA paralegals. Although I ordinarily feel as if I should not be required to defend my own work and competence to perform as a paralegal, I have taken enough dirt and slanderous derogatory insults behind my back from this individual.

- Inmate Minor's presence in the ILA office during the times when the assigned paralegals are present is a nefarious poly by Minor to intentionally eavesdrop on the paralegals' conversation with inmates and then fabricate baseless allegations that the paralegals are deficient in their jobs based on what Minor overhears. Minor's true motive seems to be to try and persuade administration to remove those paralegals from their jobs and replace them with Minor and Minor's followers.

- On the afternoon of Friday, November 19, 2021, Inmate Lucretia Stone had an appointment to do legal research and Minor was present in the ILA office. During the time when Minor left the office, Inmate Stone told me that Minor had hovered over Stone's shoulder while Stone was trying to read cases, that Minor had invaded her (Stone's) privacy, and that Minor's presence made Stone very uncomfortable. Stone mentioned that Inmate Minor was stringing along Inmate Tamasa Nobles in doing alleged court pleadings and was making no progress in the work, despite having had Nobles' papers for some time. The conduct with Stone is exactly what I am speaking about when I mention the compromise of other inmate's confidentiality. Inmate Stone had an appointment with the paralegals, not with Inmate Minor.

- Minor's antics have so disrupted the running of the ILA office that Paralegal Montalvo submitted a job-change request and wants to leave her ILA job because she can no longer tolerate the constant problems caused by Minor. I have become weary of the problems myself.

I submit and believe that Inmate Minor is not qualified to do the job as a paralegal because this inmate never completed the paralegal training course, Minor was never interviewed by the education Director or recommended for a paralegal job, there is no provision for an "Inmate legal Advisor" in the NJAC 10A Chapter 6, and Minor's presence has caused serious problems in the running of the EMCFW max-medium law library. To

## AFFIDAVIT OF CHEYENNE TILLOTSON

On the date of August 10, 2021, I came out of my assigned cell in the South hall housing unit at Edna Mahan Correctional Facility for Women (EMCFW) after the 4:00 PM inmate count was completed at 4:45 PM. When I left my cell, I was shocked to see that Inmate Carlos Martinez had been placed in the cell next to mine. This inmate is the very same person who threatened me in front of two correctional officers in the North hall unit on the date of July 21, 2021. I was moved from the North Hall unit because of the threats made against me by Carlos Martinez.

I went directly to the South Hall unit officers on August 10, 2021 and I told them that this was not going to work and that this inmate was the reason that I had been placed by EMCFW administration into the C Cottage unit briefly. I then asked for Sgt. Perez, the unit supervisor. When Sgt. Perez arrived, I explained to him that I did not feel comfortable being in the South Hall unit with Carlos Martinez because of the threats made against me by Carlos Martinez only two weeks before.

Sgt. Perez went and telephoned EMCFW administration, then returned and told me that EMCFW administration had said to handle the unit issue for the night and that I would be moved from the South Hall unit

On the next day. I wrote an inmate statement in which I wrote that I would have the unit officer lock me in my cell for the night of August 10, 2021 because EMCFW Assistance Administrator Stem had said she would move me from the South Hall unit on the next day.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____  8-18-21

Cheyenne Tillotson

Subscribed and sworn to
before me this 16th day
of August, 2021

_____
NOTARY PUBLIC OF NEW JERSEY

ALICIA LALAS
Commission # 50102885
Notary Public, State Of New Jersey
My Commission Expires
April 15, 2024

## AFFIDAVIT OF CHEYENNE TILLOTSON

On the afternoon of July 21, 2021, at the time of 3:55 PM, I was using the kiosk on South Wing in the North hall Housing unit. Inmate Carlos Martinez came out of the dayroom and asked me repeatedly "who are you writing up?" Martinez repeated this question three times until I stated "why are you worried about what I am doing on my kiosk time?" Martinez told me "you should handle your issues like a woman." I then stated "what and fight a grown-ass man?" Martinez then said "what did you say?" I responded "fight against a grown-ass man because that is how you act when you put your hands on women." Martinez then responded by saying "I should beat your pedophile ass." Martinez said this to me while standing close to me with her face in my face. Officers Hrynkiewicz and Gabriel both stood outside the wing gate doing nothing until four o'clock and I turned to them and stated to the officers "you're going to stand there and do nothing? I am now going to write you both up and I want the sergeant." I spoke with a sergeant after the inmate count was complete.

I certify that this is a true and correct description of the events which occurred in my housing unit on the date and time specified above.

Cheyenne Tillotson

Subscribed and sworn to
before me this 23rd day
of July, 2021

NOTARY PUBLIC OF NEW JERSEY

ALICIA LALAS
Commission # 50102885
Notary Public, State Of New Jersey
My Commission Expires
April 15, 2024

12/1/2021

CERTIFICATION OF TARALYN BUCKNER, SBI# 833516-G

In mid-June of this year, 2021, I, Tara Buckner, did personally witness and hear inmate LaTonia Bellamy state to another woman inmate that she wanted to move to South Hall to be with her "Boyfriend" Demetrius Minor on the same wing as "him" and next door to each other. She proceeded to state that wherever "he" went she was going to follow "him", because she is in love with "him". Ms. Bellamy used the male gender pronoun "Him" in reference to inmate Demetrius Minor herself.

Also on one occasion while Ms. Bellamy was going to clean the hospital with me during the COVID-19 Quarantine Lockdown I witnessed Ms. Beallamy and inmate Minor kissing mouth to mouth and hugging each other in a very passionate and physically intimate fashion with Ms. Bellamy's breasts pressed firmly to inmate Minor's chest.

I hereby certify that all of the foregoing is true and factual and that I did witness all of these things myself with my own eyes and ears in person. I understand that if any of the above certification is proven to be false I am subject to punishment under penalty of perjury under the laws of the state of New Jersey.

I have made the above Certification of my own free will, under no duress and without any promise of reward or threat of punishment.

Sincerley,    _Taralyn Buckner_

Taralyn Buckner

Jennifer Pasquarello, Pro Se Plaintiff
Michelle Angelina, Pro Se Plaintiff
Edna Mahan Correctional Facility
30 County Rt. 513
Clinton, N.J., 08809

-------------------------------------------------------------
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
                        Vicinage of Trenton
             -------------------------------------------

---------------------------------------------------------
JENNIFER PASQUARELLO,                  :
MICHELLE ANGELINA,                     :   Civil Action Number: 3:21-cv-18806 (ZNQ)
On Behalf of Themselves and All        :
Other Similarly Situated Women,        :   State Court Docket:HNT-L-00273-21
        Pro Se PLAINTIFFS              :
                                       :
           vs.                         :
                                       :
PHIL MURPHY, MARCUS HICKS/             :              **ORDER**
Ms. KUHN, AL KANDELL, PATRICIA         :
McGILL, DEMETRIUS MINOR,               :
CARLOS MARTINEZ,                       :
_____DEFENDANTS_____        :

     THIS MOTION HAVING BEEN BROUGHT BEFORE THE COURT by the *pro se*
Plaintiffs, Jennifer Pasquarello and Michelle Angelina, for a Preliminary
Injunction; and with the State defendants having been properly noticed
through the Attorney General; and with the Court having considered all
arguments and evidence for and against; and with Good Cause appearing:

                                       do not write below this  line
--------------------------------------------------------------------------
     It is ORDERED and ADJUDGED on this _____day of _____,
20____, that the Motion of the Plaintiffs is hereby [  ] GRANTED [  ] DENIED
in the following respects:

_____

_____

_____


                                /s/ _____
                                                    U.S.D.J.

Jennifer Pasquarello, Pro Se Plaintiff
Michelle Angelina, Pro Se Plaintiff
Edna Mahan Correctional Facility
30 County Rt. 513
Clinton, N.J., 08809

---------------------------------------

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Vicinage of Trenton

---------------------------------------

-----------------------------------------------------------

JENNIFER PASQUARELLO,           :
MICHELLE ANGELINA,              :   Civil Action Number: 3:21-cv-18806 (ZNQ)
On Behalf of Themselves and All :
Other Similarly Situated Women, :   State Court Docket:HNT-L-00273-21
       Pro Se PLAINTIFFS        :
                                :
                                :
            vs.                 :
                                :
                                :
PHIL MURPHY, MARCUS HICKS/      :   **PROOF OF SERVICE**
Ms. KUHN, AL KANDELL, PATRICIA  :
McGILL, DEMETRIUS MINOR,        :
CARLOS MARTINEZ,                :
       DEFENDANTS               :

-----------------------------------------------------------

I CERTIFY THAT on the date of [ ] November [x] December 2 , 2021, I did begin the process to serve the following documents in the above-captioned matter. The original and one copy of my *pro se* Notice of Motion for Preliminary Injunction and Supporting Documents, Proposed order and Brief in Support of Motion were mailed to the Clerk of the Court, United States District Court, Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, N.J., 08608, to be filed with the Court; and a true copy of the same documents was served upon the Office of Attorney General, State of New jersey, P.O. Box 112, 25 West Market Street, Hughes Justice Complex, Trenton, N.J., 08625, counsel for the State defendants. Service was [ ] not made upon the pro se defendants Demetrious Minor and Carlos Martinez because both defendants are in default and are not participating in the litigation [ ] made upon these defendants via U.S. Mail.

Service was made by way of First Class U.S. Mail from the Edna Mahan Correctional Facility, 20 County Route 513, Clinton, N.J., 08809, place of confinement for the plaintiffs.

Date: x November 30 2021

Date: November 30th, 2021

x Jennifer Pasquarello, Plaintiff

x Michelle Angelina, Plaintiff

18