UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                          :
JENNIFER  PASQUARELLO  and   :
MICHELLE ANGELINA,              :
                                          :        Hon. Zahid N. Quraishi, U.S.D.J.
          Plaintiffs,                   :
                                          :        Hon. Douglas E. Arpert, U.S.M.J.
          v.                               :
                                          :        CIVIL DOCKET NO. 3:21-cv-18806
GOVERNOR  PHIL  MURPHY, et   :
al.,                                       :
                                          :
          Defendants.                 :
                                          :
                                          :
_____  :

_____

BRIEF IN SUPPORT OF STATE DEFENDANTS'
MOTION TO DISMISS
_____

                         ANDREW J. BRUCK
                         ACTING ATTORNEY GENERAL OF
                         NEW JERSEY
                         R.J. Hughes Justice Complex
                         25 Market Street
                         P.O. Box 112
                         Trenton, New Jersey 08625
                         *Attorney for State Defendants*

By:   Nicholas Falcone
       Deputy Attorney General
       NJ Bar ID: 264332018
       Phone: (609) 376-2964
       Nicholas.Falcone@law.njoag.gov

       Eric Intriago
       Deputy Attorney General
       NJ Bar ID: 274302019
       Phone: (609) 376-2135
       Eric.Intriago@law.njoag.gov

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .................................................................... 1

FACTS AND PROCEDURAL HISTORY ................................................. 2

MOTION TO DISMISS STANDARD ....................................................... 6

ARGUMENT

POINT I

COUNTS ONE, TWO, THREE, FOUR, FIVE, SEVEN AND NINE SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 1983 OR THE NJCRA, AND THE POLICY IS RATIONALLY RELATED TO A LEGITIMATE PENOLOGICAL INTEREST ............................................................. 7

POINT II

STATE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR PLAINTIFFS' CONSTITUTIONAL DAMAGES CLAIMS DUE TO A LACK OF "CLEARLY ESTABLISHED" LAW ..................................................... 13

POINT III

PLAINTIFFS' RLUIPA CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT ALLEGED ANY SINCERELY HELD RELIGIOUS BELIEF, THE POLICY DOES NOT SUBSTANTIALLY BURDEN RELIGIOUS EXERCISE, AND IT ADDRESSES A COMPELLING INTEREST AND EMPLOYS THE LEAST RESTRICTIVE MEANS ............................................................. 16

A.    Plaintiffs have failed to plead that they have sincerely held religious beliefs necessary for a RLUIPA claim.............. 18

i

B.   The mere housing of transgender women at Edna Mahan cannot place a substantial burden on religious exercise .......... 19

C.   The Policy was created to further a compelling government interest and employs the least restrictive means to meet that interest ........................................................ 21

POINT IV

PLAINTIFFS' NJLAD CLAIM SHOULD BE DISMISSED BECAUSE THEY HAVE NOT ALLEGED ANY FACTS TO SUPPORT THE CONCLUSION THAT THE POLICY IS "MOTIVATED BY DISCRIMINATION" ........................................ 25

POINT V

COUNT EIGHT SHOULD BE DISMISSED BECAUSE THE POLICY IS NOT SUBJECT TO THE RULEMAKING REQUIREMENTS OF THE NEW JERSEY ADMINISTRATIVE PROCEDURE ACT ........................................ 27

CONCLUSION ...................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdulhaseeb v. Calbone*,
  600 F.3d 1301 (10th Cir. 2010) ............................................................ 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................. 6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................. 6

*Bell v. Wolfish*,
  441 U.S. 520 (1979) .............................................................................. 8

*Bland v. City of Newark*,
  900 F.3d 77 (3d Cir. 2018) .................................................................. 15

*Bistrian v. Levi*,
  696 F.3d 352 (3d Cir. 2012) ................................................................ 6

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ........................................................... 2, 3

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ....................................................................... 18, 21

*Chisolm v. Manimon*,
  97 F. Supp. 2d 615 (D.N.J. 2000) ...................................................... 26

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005) ....................................................................... 19-20

*Dehart v. Horn*,
  227 F.3d 47 (3d Cir. 2000) (en banc) ................................................. 9

*District of Columbia v. Wesby*,
  138 S. Ct. 577 (2018) .......................................................................... 14

*Doe v. Boyertown Area Sch. Dist.*,
　897 F.3d 518 (3d Cir. 2018)...............................................................9-10, 22-25

*Doe v. Delie*,
　257 F.3d 309, 317 (3d Cir. 2001).....................................................................8-9

*Doe v. Poritz*,
　662 A.2d 367 (N.J. 1995)................................................................................. 12

*Driever v. United States*,
　2020 U.S. Dist. LEXIS 192695 (D.D.C. Oct. 19, 2020) ............................ 15, 21

*In re Donald J. Trump Casino Sec. Litig.*,
　7 F.3d 357 (3d Cir. 1997).................................................................................. 3

*El v. City of Pittsburgh*,
　975 F.3d 327 (3d Cir. 2020).............................................................................. 14

*Equitable Life Mortg. & Realty Investors v. New Jersey Div. of Taxation*,
　376 A.2d 966 (N.J. Super. App. Div. 1977) ...................................................... 28

*Flack v. Wisconsin Dep't of Health Servs.*,
　328 F. Supp. 3d 931 (W.D. Wis. 2018) ............................................................ 23

*Florentino v. City of Newark*,
　No. 2:19-cv-21055, 2020 U.S. Dist. LEXIS 157264 (D.N.J. Aug. 31,
　2020)................................................................................................................. 26

*Fowler v. UPMC Shadyside*,
　578 F.3d 203 (3d Cir. 2009)............................................................................... 6

*Franklin v. District of Columbia*,
　163 F.3d 625 (D.C. Cir. 1998) ................................................................... 10, 15

*Freeman v. McDonnell*,
　No. 18-7802 (BRM) (ZNQ), 2021 U.S. Dist. LEXIS 21262 (D.N.J.
　Feb. 4, 2021) .................................................................................................... 27

*Glass v. Suburban Restoration Co.*,
　722 A.2d 944 (N.J. App. Div. 1998)................................................................. 27

iv

*Grimes v. New Jersey Department of Corrections*,
  174 A.3d 1010 (N.J. Super. App. Div. 2017) .................................................... 30

*Guy v. Espinoza*,
  No. 1:19-cv-00498, 2020 U.S. Dist. LEXIS 9893 (E.D. Cal. Jan. 21,
  2020)................................................................................................................. 16

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ......................................................................................... 13

*Hewitt v. Helms*,
  459 U.S. 460 (1983) ........................................................................................... 8

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ......................................................................................... 20

*James v. N.J. State Police (In re Gibbons)*,
  957 F.3d 165 (3d Cir. 2020) ...................................................................... 14, 15

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018) ..................................................................................... 14

*Lamont v. New Jersey*,
  637 F.3d 177 (3d Cir. 2011) ............................................................................ 14

*Mack v. Comm'r Semple*,
  No. 3:16-cv-875 (VAB), 2016 U.S. Dist. LEXIS 162267 (D. Conn.
  Nov. 23, 2016).................................................................................................. 16

*Metromedia, Inv. v. Director, Division of Taxation*,
  478 A.2d 742 (N.J. 1984).................................................................................. 29

*Morillo v. Torres*,
  117 A.3d 1206 (N.J. 2015)................................................................................ 14

*Ochs v. Thalacker*,
  90 F.3d 293 (8th Cir. 1996).............................................................................. 21

*Olim v. Wakinekona*,
  461 U.S. 238 (1983) .................................................................................. 10, 15

v

*Partovi v. Felician Coll.*,
  No. A-1961-09T1, 2011 N.J. Super. Unpub. LEXIS 645 (N.J. App.
  Div. Mar. 15, 2011) ................................................................................ 26-27

*Procunier v. Martinez*,
  416 U.S. 396 (1974) ..................................................................................... 9

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ................................................................................... 13

*Pryor v. Department of Corrections*,
  929 A.2d 1091 (N.J. Super. App. Div. 2007) ................................................. 13

*In re Rules Adoption Regarding Inmate Mail to Attys.*,
  576 A.2d 274 (N.J. 1990) ........................................................................ 12-13

*Sandin v. Conner*,
  515 U.S. 472 (1995) ............................................................................... 7, 15

*Sands v. McCormick*,
  502 F.3d 263 (3d Cir. 2007) ......................................................................... 3

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ..................................................................... 2-3

*Small v. Lehman*,
  98 F.3d 762 (3d Cir. 1996) .......................................................................... 18

*Sojourner A. v. N.J. Dep't of Human Servs.*,
  828 A.2d 306 (N.J. 2003) ............................................................................ 12

*In re Solid Waste Util. Customer Lists*,
  524 A.2d 386 (N.J. 1987) ............................................................................ 29

*State v. Ramseur*,
  524 A.2d 188 (N.J. 1987) ............................................................................ 12

*State v. Zuber*,
  152 A.3d 197 (N.J. 2017) ............................................................................ 12

*Taylor v. Barkes*,
  575 U.S. 822 (2015) .................................................................................... 13

vi

*Texter v. Dep't of Human Servs.*,
   443 A.2d 178 (N.J. 1992)....................................................................... 29

*Trafton v. City of Woodbury*,
   799 F. Supp. 2d 417 (D.N.J. 2011) ..................................................... 12

*Turner v. Safley*,
   482 U.S. 78 (1987).............................................................................8-9

*Vazquez v. Ragonese*,
   393 F. Appx. 925 (3d Cir. 2010)................................................... 18, 19

*Washington v. Harper*,
   494 U.S. 210 (1990) ........................................................................ 8, 9

*Washington v. Klem*,
   497 F.3d 272 (3d Cir. 2007)........................................................ 18, 19

*West v. Kind*,
   Case No. 17-cv-482-pp, 2020 U.S. Dist. LEXIS 40210 (E.D. Wis.
   March 9, 2020) ................................................................................... 21

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017).............................................. 10, 23-24

*White v. Pauly*,
   137 S. Ct. 548 (2017) ........................................................................ 15

*Wronko v. Howell Twp.*,
   No. 3:17-cv-1956-BRM-DEA, 2018 U.S. Dist. LEXIS 10577 (D.N.J.
   Jan. 23, 2018) .................................................................................... 11

**Statutes**

42 U.S.C. 2000cc(a)(1) ......................................................................... 18

42 U.S.C. § 2000cc-1 ............................................................................ 18

42 U.S.C. § 2000cc-1(a) ........................................................................ 19

42 U.S.C. § 1983 ................................................................................. 4, 7

N.J. Stat. Ann. § 10:5-4 ......................................................................... 26

N.J. Stat. Ann. § 52:14B-2 ............................................................................ 30

N.J. Stat. Ann. § 52:14B-3.2 ......................................................................... 29

**Other Authorities**

*Fed. R. Civ. P.* 12(b)(6) ........................................................................... 5, 6

*Fed. R. Civ. P.* 56 ...................................................................................... 2

*N.J. Court Rule* 2:2-3(a)(2) ..................................................................... 28

## PRELIMINARY STATEMENT

In 2019, the New Jersey Department of Corrections ("DOC") adopted an Internal Management Procedure titled "Transgender, Intersex and Non-Binary Inmates" ("the Policy"). The Policy establishes protections for transgender, intersex and non-binary inmates, including a presumption that inmates will be housed in line with their gender identity.

Plaintiffs are inmates currently incarcerated at Edna Mahan Correctional Facility for Women ("Edna Mahan").  They assert a variety of claims challenging the Policy because it has caused more transgender women who have not undergone gender-confirmation surgery to be housed at Edna Mahan.

Plaintiffs complain that the physical characteristics of the transgender inmates are intimidating because they appear too masculine. They also complain about the Policy's effect on ordinary consequences of being incarcerated with other inmates, such as the possibility that the transgender women might observe other inmates in a state of undress. Many of the allegations pertain to events Plaintiffs did not personally observe, participate in, or otherwise witness. While Plaintiffs do allege that two transgender inmates made verbal threats towards them, they do not allege any physical altercation occurred. Finally, Plaintiffs do not allege that they personally possess any specific sincerely held religious belief, but instead assert that the Policy substantially burdens the unspecified sincerely held beliefs of other

unnamed inmates.

The claims fail as a matter of law. Plaintiffs' alleged facts fail to state a constitutional claim because the Policy is directly related to the legitimate penological and governmental interests in protecting transgender inmates. State Defendants are further entitled to qualified immunity on all of the constitutional claims for damages because the rights Plaintiffs assert are not clearly established. Plaintiffs also fail to state claims under Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the New Jersey Law Against Discrimination ("NJLAD"), and the New Jersey Administrative Procedures Act ("APA"). As a result, all of Plaintiffs' claims against State Defendants must be dismissed.

## FACTS AND PROCEDURAL HISTORY[1]

In 2019, the DOC adopted Internal Management Procedure PCS.001.TGI.01, titled "Transgender, Intersex and Non-Binary Inmates." Certification of Nicholas Falcone ("Falcone Cert."), Exhibit A.[2]  The Policy establishes procedures regarding

---

[1] Both sections are combined for the Court's convenience.

[2]  State Defendants acknowledge that a motion to dismiss is ordinarily based upon the content of the pleading, and submitting matters outside the pleading generally requires the court to treat the motion as one for summary judgment under *Fed. R. Civ. P.* 56.  But courts may consider "document[s] integral to or explicitly relied upon in the complaint" without converting the motion to dismiss into a motion for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). In such cases, "what is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document

the health, safety, and dignity of transgender, intersex, and non-binary inmates.  It ensures inmates are housed in line with their gender identity and their needs are addressed consistent with the Prison Rape Elimination Act (PREA) standards, the New Jersey Law Against Discrimination (NJLAD), and departmental regulation, policies and procedures." *Id.* at 1, 3.  The Policy sets comprehensive policies and procedures for identifying inmates' gender identity, *id.* at 4-5, and housing and classification reviews, *id.* at 5-8, respect and confidentiality, *id.* at 8-9, medical treatment, *id.* at 9; privacy and searches, *id.* at 9, and personal property, *id.* at 10.

Plaintiffs Jennifer Pasquarello and Michelle Angelina, both currently incarcerated at Edna Mahan, initiated this action on June 25, 2021, in the Superior Court of New Jersey, Law Division – Hunterdon County. Plaintiffs then filed the Amended Complaint on August 5, 2021.[3] The Amended Complaint names State

---

was explicitly cited." *Id.* (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1997); *Shaw*, 82 F.3d at 1220)). Because Plaintiffs' claims directly challenge the Policy, the Amended Complaint is "based" on the Policy and it is integral to the Amended Complaint. Further, courts may consider documents of public record without converting a motion to dismiss into a motion for summary judgment. *See, e.g., Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).  Here, the court can take judicial notice of the Internal Management Procedure because it is a public record. The Policy is filed on the public court docket of *Sonia Doe v. New Jersey Dep't of Corr.*, a case that was litigated in the Superior Court of New Jersey, Law Division – Mercer County, bearing Docket No. MER-L-1586-19. Therefore, the Court may also consider the Policy as an integral document without converting this to a motion for summary judgment.

[3]  Plaintiffs also filed a motion to certify a class on August 5, 2021. The Superior Court administratively withdrew that motion after the matter was removed.

officials Governor Phil Murphy, former Commissioner Marcus Hicks, Acting Commissioner Victoria Kuhn, Deputy Commissioner Al Kandell, and Administrator Patricia McGill (collectively "State Defendants") as Defendants. Current inmate Demitrius Minor and former inmate Carlos Martinez are also named Defendants.[4] On October 15, 2021, State Defendants filed a Notice of Removal with this court. ECF No. 1. On November 15, 2021, Plaintiffs filed a motion to remand this case back to Superior Court. ECF No. 5.

Plaintiffs challenge the Policy because it permits housing transgender Plaintiffs bring claims under the 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA") for alleged violations of their rights under the Federal and State Constitutions, RLUIPA, the NJLAD, and the APA. Plaintiffs assert the Policy has led to more transgender women who have not undergone gender-confirmation surgery being housed at Edna Mahan. Plaintiffs allege such inmates, specifically Minor and Martinez, have not received gender-confirmation surgery, and thus still possess male genitalia. Am. Compl., ¶¶ 12-13.

A large portion of the Amended Complaint—specifically, Count One—is devoted to allegations on behalf of other unidentified Edna Mahan inmates regarding

---

[4] The two non-State Defendants use the names Demi Minor and Royal Essence Martinez, respectively, and that is how the State will otherwise refer to them. The State only refers to these other names to match up to the relevant pleadings for the convenience of the Court. Plaintiffs sought and obtained default against these two defendants prior to State Defendants removing this case to District Court.

their interactions with transgender inmates. Plaintiffs make allegations about events in which they themselves were not involved or have witnessed. These include vague alleged differences in inmate discipline between cisgender inmates and transgender inmates and concerns of unnamed inmates being afraid to go to the law library due to the presence of transgender inmates. *See id.* ¶¶ 60, 74. Plaintiffs also allege that transgender women can view female inmates in various stages of undress in their cells or walking to the showers. *Id.* ¶¶ 40; *see also id.* ¶ 42. They claim this violates the religious beliefs of other female inmates, but do not allege that they themselves hold such beliefs. *Id.* ¶ 41.

Plaintiffs' claims are based in large part on the physical appearance of the transgender inmates. The Amended Complaint refers to the masculine appearance of the transgender inmates, including facial hair, deep male voices and the manner in which they carry themselves as intimidating other inmates. *See id.* ¶¶ 42, 46. Plaintiffs also allege that Martinez and Minor verbally threatened them on several occasions. *Id.* ¶¶ 52, 57, 107, 109, 116.

Because Plaintiffs have failed to state a claim for relief, State Defendants now move to dismiss the Amended Complaint under *Fed. R. Civ. P.* 12(b)(6).

## MOTION TO DISMISS STANDARD

*Fed. R. Civ. P.* 12(b)(6) permits the dismissal of a complaint for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Federal courts use a two-part analysis to determine whether to dismiss a complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, courts separate the factual and legal elements of the claim. The court must "accept as true all well-pled factual allegations" and draw all reasonable inferences in favor of the plaintiff. *Bistrian v. Levi*, 696 F.3d 352 n.1 (3d Cir. 2012); *Fowler*, 578 F.3d at 210-11. The court may "disregard any legal conclusions." *Fowler*, 578 F.3d at 210. The court must then determine whether the facts alleged in the complaint are "sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662. A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed. *See Fowler*, 578 F.3d at 211.

**ARGUMENT**

**POINT I**

**COUNTS ONE, TWO, THREE, FOUR, FIVE, SEVEN AND NINE SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 1983 OR THE NJCRA, AND THE POLICY IS RATIONALLY RELATED TO A LEGITIMATE PENOLOGICAL INTEREST.**

Plaintiffs plead a variety of claims under 42 U.S.C. § 1983 and the NJCRA, asserting the Policy violates their rights under both the Federal and State Constitutions. Though Plaintiffs make a litany of allegations, their constitutional claims rest primarily on their challenge to the DOC's policy and practice of housing transgender women at Edna Mahan. But because that policy is reasonably related to a legitimate penological interest, those constitutional claims should be dismissed.

The Supreme Court has held that "federal courts ought to afford appropriate deference and flexibility to state prison officials trying to manage a volatile environment," and that "[s]uch flexibility is especially warranted in [the] fine tuning of ordinary incidents of prison life, a common subject of prisoner claims." *Sandin v. Conner*, 515 U.S. 472, 483-83 (1995). To ensure that courts exercise the appropriate amount of deference to the considered policy choices made by corrections officials, the Supreme Court has instructed that "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain

institutional security." *Hewitt v. Helms*, 459 U.S. 460, 472 (1983) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), the Court set a standard to assess the reasonableness of a prison rule. And while *Turner* specifically addressed only an inmate's First Amendment right to communicate with other inmates and the fundamental right to marry while incarcerated, the Court later clarified that the standard in *Turner* should apply in "all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment." *Washington v. Harper*, 494 U.S. 210, 224 (1990)

In *Doe v. Delie*, the Third Circuit explained the applicable standard where an inmate challenges a prison policy or regulation on constitutional grounds. 257 F.3d 309, 317 (3d Cir. 2001). The court noted that the *Turner* standard requires courts to "respect the administrative concerns underlying a prison regulation, without requiring proof that the regulation is the least restrictive means of addressing those concerns." *Id*. The court explained the four factors that need to be weighed:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the

> regulation that fully accommodate the prisoner's rights at
> de minimis cost to valid penological interests.
>
> [*Id.* (quoting *Dehart v. Horn*, 227 F.3d 47, 51 (3d Cir.
> 2000) (en banc)]

The *Turner* "test is intended to effect an accommodation between two well-established principles." *Dehart*, 227 F.3d at 51. Those principles are (1) "that federal courts must take cognizance of the valid constitutional claims of prison inmates," *Id.* at 51 (quoting *Turner*, 482 U.S. at 84), and (2) the recognition that courts are ill-equipped to deal with the increasingly urgent problems of prison administration and [that] separation of powers concerns counsel a policy of judicial restraint." *Id.* (internal citations and quotation marks omitted) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). Therefore, *Turner* "assumes as a predicate that the plaintiff inmate has demonstrated that a constitutionally protected interest is at stake." *Id.*

Here, the Policy at issue was put in place by DOC officials in order "to address the needs of transgender, intersex, and non-binary inmates in a manner consistent with the federal Prison Rape Elimination Act (PREA) standards, the New Jersey Law Against Discrimination (NJLAD), and in accordance with departmental regulation, policies and procedures." Falcone Cert., Ex. A. As the Third Circuit has stated, "[t]here can be 'no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.'" *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3d Cir. 2018) (quoting *Whitaker v. Kenosha Unified*

*Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017)). Likewise, one need of transgender inmates, to use the Policy's language, is to be free from such discrimination, harassment, and violence. Ensuring the health and safety of these inmates is certainly a legitimate penological and governmental interest. By creating a procedure for determining an inmate's gender identity, and a presumption that transgender inmates will be housed in a facility consistent with their gender identity, the Policy directly supports that interest.

Plaintiffs complain that they are not comfortable being housed alongside any transgender women who have not received gender-confirmation surgery, pointing to their allegedly intimidating appearance and characteristics. *See* Am. Compl. ¶¶ 42, 46. But merely housing both cisgender and transgender women at Edna Mahan is not itself a violation of Plaintiffs' constitutional rights because inmates have no constitutionally protected interest in their place of confinement—let alone rights to control the housing assignment *of other inmates*. *See Olim v. Wakinekona*, 461 U.S. 238 (1983); *see also Franklin v. District of Columbia*, 163 F.3d 625, 631, 634-35 (D.C. Cir. 1998) (absent "extraordinary" treatment, "day-to-day" judgments about placement, housing, and classification are "ordinary consequence[s] of confinement for committing a crime"). But even if a constitutionally protected interest were at stake, the Policy satisfies the *Turner* standard. It is directly relates to the legitimate objective of addressing the needs of transgender inmate to the extent that housing

inmates in a facility inconsistent with their gender identity could undermine those needs. *Cf. Boyertown*, 897 F.3d at 530 (explaining "forcing transgender students to use single-user [bathroom] facilities or those that correspond to their birth sex [would] not serve the compelling interest" of protecting students, and would in fact "significantly undermine it"). Further, beyond housing cisgender and transgender women at the same facility, there is no apparent alternative that would still meet the State's legitimate interest in housing transgender inmates in line with their gender identity that would come at a de minimis cost.

Plaintiffs also assert the Policy violates comparable rights under the New Jersey Constitution and bring various claims under the NJCRA. But because those claims and Plaintiff's Section 1983 claims are subject to the same analyses, Plaintiff's NJCRA claims must also be dismissed.

The District Court for the District of New Jersey "has repeatedly interpreted the NJCRA analogously to § 1983." *See Wronko v. Howell Twp.*, No. 3:17-cv-1956-BRM-DEA, 2018 U.S. Dist. LEXIS 10577, at *16 (D.N.J. Jan. 23, 2018) (collecting cases). "The NJCRA is therefore generally interpreted nearly identically to § 1983 and claims under the NJCRA are generally coterminous with and subject to the same defenses and immunities as those brought under § 1983." *Id.* (citing *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011)). Therefore, courts "analyze Plaintiffs' NJCRA claims through the same lens of § 1983." *Id.* (quoting

*Trafton*, 799 F. Supp. 2d at 444).

In addition, New Jersey courts interpret the relevant provisions of the New Jersey Constitution largely in reliance on, or consistently with, federal case law on comparable provisions of the United States Constitution. *See, e.g.*, *Sojourner A. v. N.J. Dep't of Human Servs.*, 828 A.2d 306, 313 (N.J. 2003); *State v. Zuber*, 152 A.3d 197 (N.J. 2017) ("'The test to determine whether a punishment is cruel and unusual . . . is generally the same' under both the Federal and State Constitutions.") (quoting *State v. Ramseur*, 524 A.2d 188, 210 (N.J. 1987)); *Doe v. Poritz*, 662 A.2d 367, 414 (N.J. 1995) ("Article I, paragraph 1 of [the State] Constitution has been interpreted as conferring the right to equal treatment under the law, a right analogous to the guarantee of equal protection under the Fourteenth Amendment to the Federal Constitution."); *but see Poritz*, 662 A.2d at 314 ("Although conceptually similar, the right under the State Constitution can in some situations be broader than the right conferred by the Equal Protection clause").

More importantly, the Supreme Court of New Jersey also applies the *Turner* test to any Department of Corrections policy that affects only inmates when it determines their lawfulness under the New Jersey Constitution. *See In re Rules Adoption Regarding Inmate Mail to Attys.*, 576 A.2d 274, 279 (N.J. 1990); *see also Pryor v. Department of Corrections*, 929 A.2d 1091, 1102 (N.J. Super. App. Div. 2007) (noting "the state constitution provides no more protection than the Federal

Constitution on these issues"). Thus, as noted above, Plaintiffs' state constitutional claims under the NJCRA also fail.

Thus, all of Plaintiffs constitutional claims asserted under both section 1983 and the NJCRA should dismissed with prejudice because the Policy meets scrutiny under the *Turner* test.

## POINT II

### STATE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR PLAINTIFFS' CONSTITUTIONAL DAMAGES CLAIMS DUE TO A LACK OF "CLEARLY ESTABLISHED" LAW.

To the extent that Plaintiffs' constitutional claims seek damages from State Defendants, they should also be dismissed because State Defendants are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified-immunity defense is available where a plaintiff is challenging the constitutionality of a policy itself. *See Taylor v. Barkes*, 575 U.S. 822, 872 (2015). The doctrine applies equally to claims brought under the NJCRA as well as those under 1983. *See Morillo v. Torres*, 117 A.3d 1206, 1208 (N.J. 2015).

The analysis consists of two questions: "(1) whether the [official] violated a

constitutional right, and (2) whether the right was clearly established, such that 'it would [have been] clear to a reasonable [official] that his conduct was unlawful.'" *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020) (second alteration in original) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011)). "Clearly established means that, at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *James v. N.J. State Police (In re Gibbons)*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

In most cases, where a constitutional violation is not "obvious," "settled law must squarely govern the specific facts at issue." *Id.* (internal citations and quotation marks omitted) (quoting *Wesby*, 138 S. Ct. at 590; *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). To meet this standard, "a plaintiff may . . . 'identify[] a case where an [official] acting under similar circumstances as [the defendant officer] was held to have violated the [constitutional provision at issue].'" *Id.* at 169-70 (final alteration in original) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). In the qualified-immunity context, such "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'" *Id.* at 170 (quoting *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018)).

Here, none of the rights that Plaintiffs appear to assert are clearly established.

Plaintiffs challenge the DOC's policy of housing at Edna Mahan transgender women who have not received gender-confirmation surgery. A prisoner has no protected interest in the housing designation of others, and certainly not a clearly established one. *See Sandin*, 515 U.S. at 484; *Franklin*, 163 F.3d at 631, 634-35 (agreeing "day-to-day" judgments about placement, housing, and classification of inmates are the "ordinary consequence[s] of confinement for committing a crime").

In *Driever v. United States*, the plaintiff, a cisgender female inmate, challenged a federal "Bureau of Prisons policy that authorizes housing transgender prisoners according to their gender identity." 2020 U.S. Dist. LEXIS 192695, at *1 (D.D.C. Oct. 19, 2020). In dismissing the plaintiff's individual-capacity claims for monetary damages on the basis of qualified immunity, the court found that the plaintiff "cites no case law that suggests that the constitutional claims she presents arise from clearly established law." *Id.* at *20-21 (citing *Mack v. Comm'r Semple*, No. 3:16-cv-875 (VAB), 2016 U.S. Dist. LEXIS 162267, at *3 (D. Conn. Nov. 23, 2016) (finding that all reported cases asserting failure to protect based on the housing placement of transgender inmates involve claims filed by transgender inmates seeking to be housed in line with their gender identity), *appeal dismissed*, No. 16-4331, 2017 WL 6806654 (2d Cir. Feb. 22, 2017, effective Mar. 15, 2017)); *see also Guy v. Espinoza*, No. 1:19-cv-00498, 2020 U.S. Dist. LEXIS 9893, at *13 (E.D. Cal. Jan. 21, 2020) (finding "there is not any clearly established law determining the

appropriate classification and housing of transgender inmates, nor is there clearly established law that a female-born inmate has a constitutional right to not be housed with post-operative male-to-female transgender inmates").

For the reasons argued in Point I, State Defendants have not violated Plaintiffs' constitutional rights. And at the very least, there is no clearly established law that would put State Defendants on notice that implementing the Policy violated the either the United States or State Constitution. No damages are proper.

## POINT III

**PLAINTIFFS' RLUIPA CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT ALLEGED ANY SINCERELY HELD RELIGIOUS BELIEF, THE POLICY DOES NOT SUBSTANTIALLY BURDEN RELIGIOUS EXERCISE, AND IT ADDRESSES A COMPELLING INTEREST AND EMPLOYS THE LEAST RESTRICTIVE MEANS.**

Count Three should be dismissed because Plaintiffs have failed to plead that their own religious practices have been substantially burdened by the Policy. The Amended Complaint focuses on how the Policy allegedly imposes a substantial burden on the religious beliefs of others, not Plaintiffs. Even if Plaintiffs sufficiently pled that their own religious exercise has been substantially burdened, Count Three should still be dismissed because the Policy furthers a compelling government interest in the least restrictive means possible. Without the policy, transgender inmates would be placed in a correctional facility inconsistent with their current

16

gender identity, which in turn places those transgender inmates at serious risk of physical and sexual violence.

As noted in Point I, A, the Supreme Court has determined the *Turner* factors should apply anytime an inmate claims that a considered policy implemented by prison officials violates her constitutional rights. But eventually Congress in effect overturned *Turner* in the context of inmate free exercise of religion claims when it enacted the Religious Freedom Restoration Act ("RFRA"), and then its sister-statute RLUIPA, which both sought to establish a heightened standard of review for inmate religious exercise claims. *See Small v. Lehman*, 98 F.3d 762, 766 (3d Cir. 1996); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (noting that RLUIPA adopted the same standard as RFRA).

Count Three of Plaintiffs' Amended Complaint here alleges a violation of RLUIPA. *See* 42 U.S.C. § 2000cc-1. In an inmate RLUIPA case[5], a "plaintiff-inmate bears the burden to show that a prison institution's policy or official practice has substantially burdened the practice of that inmate's religion." *Washington v. Klem*, 497 F.3d 272, 277-78 (3d Cir. 2007). For the purposes of RLUIPA, a substantial burden exists only where: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other

---

[5] The statute also governs land use restrictions placed upon religious assembly or institutions. *See* 42 U.S.C. 2000cc(a)(1).

inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Id.*, at 279-80; *see Vazquez v. Ragonese*, 393 F. Appx. 925, 928-29 (3d Cir. 2010). If a Plaintiff is able to show a substantial burden on her exercise of religion, the burden then shifts to Defendant to show "that the policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest." *Klem*, 497 F.3d at 283 (citing 42 U.S.C. § 2000cc-1(a)). The application of RLUIPA's standard is context-specific, and deferential to the prison authorities' choices about how to run their institutions. *Vazquez*, 393 F. Appx. at 929; *Klem*, 497 F.3d at 283 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005)).

A.  Plaintiffs have failed to plead that they have sincerely held religious beliefs necessary for a RLUIPA claim.

Count Three should be dismissed because Plaintiffs do not allege that any DOC policy or practice has burdened *their own* religious practices, which they must establish to prevail on a RLUIPA claim. Rather, Plaintiffs allege that "[m]any of the women at Edna Mahan have religious beliefs against exposing their partially clad or unclad bodies to members of the opposite sex and are inhibited from using the toilet or showering because of fears of being seen in an undressed condition by the male inmates." Am. Compl., ¶ 41. Plaintiffs add that "[t]he presence of the male inmates

has imposed a substantial burden on the exercise of [those inmates'] religious beliefs. *Id.* Thus, because the Amended Complaint does not allege Plaintiff's own religious practices have been substantially burdened, Plaintiffs fail to make out a *prima facie* RLUIPA claim. *See Klem*, 497 F.3d at 277-78.  This Court need go no further to dismiss the claim—this is a fatal defect in the Complaint.

B. The mere housing of transgender women at Edna Mahan cannot place a substantial burden on religious exercise.

Plaintiffs' RLUIPA claim should also be dismissed because they have failed to adequately plead that DOC has placed a substantial burden on religious exercise by housing transgender female inmates at Edna Mahan. Ordinarily, prison-centered RLUIPA claims are based on prison officials preventing a plaintiff from engaging in a specific religious practice or obtaining items essential to such a practice.  *See e.g. Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (prohibiting Muslim inmates from growing beards constitutes a substantial burden); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1314-15 (10th Cir. 2010) (inability to consume Halal meats on holidays could be a substantial burden). In such scenarios, there are typically only two stakeholders in the litigation: the plaintiff and the relevant prison officials. In contrast, Plaintiffs here plead a novel claim—the mere presence of a specific class of inmates offends the beliefs of others—that inherently affects the lives of other inmates around them. But the Supreme Court has counseled that when analyzing prison RLUIPA claims

19

"courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Cutter*, 544 U.S. at 720 (referring to third parties who may face collateral consequences from accommodating an observer's burden).

In fact, the federal courts have consistently rejected claims where a plaintiff asserts that the mere presence of another type of inmate offends their religious sensibilities. *Cf. Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996); *see Driever*, 2020 U.S. Dist. LEXIS 192695 at *26-27 (D.D.C. Oct. 19, 2020) (noting qualified immunity would likely preclude such a claim as Plaintiffs here); *see also West v. Kind*, Case No. 17-cv-482-pp, 2020 U.S. Dist. LEXIS 40210 *32 (E.D. Wis. March 9, 2020) (holding that a transgender officer merely being present for strip search does not substantially burden religious exercise under RLUIPA).

In *Ochs*, the plaintiff was a white supremacist who claimed that his beliefs as a "Church of Jesus Christ Christian" prohibited him from being housed with African American inmates. *Ochs*, 90 F.3d at 296. While the court affirmed the dismissal of Ochs' claims on other grounds, it also voiced skepticism that merely being housed with inmates of another race could constitute a substantial burden.[6] *Id.* In doing so, the court noted that while Ochs' claim was based on a purported religious mandate, it was "directed at an entirely secular aspect of life, the race of his cellmate." *Id.* The

---

[6] While the Ochs' claim was made under RFRA, the standards applied under that law were mirrored by its sister-law RLUIPA. *Burwell*, 573 U.S. at 725.

court noted that, by recognizing such a claim as placing a substantial burden on religious exercise, such claims could disrupt virtually other entirely secular aspects of prison life for the entire prison population such as "the timing of meals, the number of showers, the television programs and movies to be viewed, or most any other aspect of prison life."

Plaintiffs' RLUIPA claim cannot constitute a substantial burden on religious exercise because it would disrupt an entirely secular aspect of life at Edna Mahan and would burden the rights of third-party non-beneficiaries—transgender inmates housed at Edna Mahan—by prohibiting them from being housed in a manner that corresponds with their gender identity.

C. The Policy was created to further a compelling government interest and employs the least restrictive means to meet that interest.

Further, even if Plaintiffs satisfied these threshold elements, Count Three should be dismissed because the Policy furthers a compelling government interest, and employs the least restrictive means to meet it. *Cf. Boyertown*, 897 F.3d at 529. The DOC's interest here is to further "the health, safety, and dignity of transgender, intersex, and non-binary inmates," Falcone Cert., Ex. A, at I, and to protect these inmates from discrimination, harassment and violence by "address[ing] the needs of transgender, intersex, and non-binary inmates in a manner consistent with federal Prison Rape Elimination Act (PREA) standards, [and] the New Jersey Law Against

Discrimination (NJLAD)." Falcone Cert., Ex. A, at III.  And those goals are ones that are the same or substantially similar to ones that the Third Circuit and other federal courts have found to be a compelling government interest. *Id.* at 528 ("no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity" (quoting *Whitaker*, 858 F.3d at 1051)); *see also Flack v. Wisconsin Dep't of Health Servs.*, 328 F. Supp. 3d 931, 934 (W.D. Wis. 2018) ("[A]s a group, transgender individuals have been subjected to harassment and discrimination in virtually every aspect of their lives, including housing, employment, education, and health care").

In *Doe v. Boyertown*, the Third Circuit considered the plaintiffs' challenge to a school district policy "allowing transgender students to use bathrooms and locker rooms that are consistent with the students' gender identities as opposed to the sex they were determined to have at birth." 897 F.3d at 521. The court affirmed the denial of a preliminary injunction against the policy, holding that the plaintiffs were unlikely to succeed on their claim that the policy violated their constitutional right to privacy. *Id.* at 526. The plaintiffs asserted that "their right to privacy was violated because the policy permitted them to be viewed by members of the opposite sex while partially clothed." *Id.* at 527.

The Third Circuit summarized its holding on that question by explaining that, "[r]egardless of the degree of the appellants' undress at the time of the encounters,

the District Court correctly found that this would not give rise to a constitutional violation because the School District's policy served a compelling interest—preventing discrimination against transgender students—and was narrowly tailored to that interest" in permitting transgender students to use the bathroom aligned with their gender identity. *Id.* at 527-28. The Third Circuit stressed that "[t]here can be 'no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.'" *Id.* at 528 (quoting *Whitaker*, 858 F.3d at 1051). The court was specifically "unpersuaded to the extent that the appellants' asserted privacy interest requires protection from the risk of encountering students in a bathroom or locker room whom appellants identify as being members of the opposite sex." *Id.* at 531; *see also Whitaker*, 858 F.3d at 1052.

Like the school district's interest in *Doe v. Boyertown*, the DOC's interest here is compelling, and in furtherance of that interest, the Policy creates comprehensive procedures for determining an inmate's gender identity, and meeting the needs of a transgender inmate, including an important presumption that a transgender inmate in the DOC's custody will be housed on the basis of his or her gender identity. *See* Falcone Cert., Ex. A. In contrast, housing transgender inmates in a facility that is inconsistent with their gender identity, or isolated from all other inmates, directly undermines their needs. *See Boyertown*, 897 F.3d at 530 (explaining that "forcing transgender students to use single-user [bathroom] facilities or those that correspond

to their birth sex [would] not serve the compelling interest" of protecting transgender students, and would in fact "significantly undermine it").

And the means employed by Policy here to meet that interest is substantially narrower than the policy of the school district in *Doe v. Boyertown* that the Third Circuit found narrowly tailored. The DOC Policy regarding housing transgender inmates requires that an individualized assessment be made for each individual inmate that "considers on a case-by-case basis whether a particular placement would ensure the inmate's health and safety." Falcone Cert., Ex. A at IV, B, 3. The Policy requires that the Department's PREA Accommodation Committee consider a multitude of factors on a case-by-case basis. *Id.* at IV, B, 4, b, iii. And the Policy even permits the Committee to note and consider when it has "a substantiated, credible, and non-discriminatory basis for believing that an inmate is not sincere in their assertion of their gender identity and is asserting it for an improper purpose." *Id.* at IV, B, 4, a. Thus, the Policy is in many ways much narrower than the bathroom policy that the Third Circuit found to be narrowly tailored in *Doe v. Boyertown*.

As a result, Plaintiffs' RLUIPA claim should be dismissed for all of the above stated reasons.

## POINT IV

**PLAINTIFFS' NJLAD CLAIM SHOULD BE DISMISSED BECAUSE THEY HAVE NOT ALLEGED ANY FACTS TO SUPPORT THE CONCLUSION THAT THE POLICY IS "MOTIVATED BY DISCRIMINATION".**

Count Six, which alleges a violation of the NJLAD, should be dismissed because the Amended Complaint fails to plead any facts showing that any of Defendants' actions were motivated by discrimination or that other individuals in Plaintiffs' position suffered similar consequences.

The NJLAD provides that "[a]ll persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . sex." N.J. Stat. Ann. § 10:5-4. In interpreting the NJLAD, New Jersey courts generally rely "upon [the construction of] analogous federal antidiscrimination statutes." *Chisolm v. Manimon*, 97 F. Supp. 2d 615, 621 (D.N.J. 2000). In order to state a claim under the NJLAD for discrimination in a place of public accommodation, a Plaintiff must, (1) "demonstrate that she is a member of a protected class"; (2) must "show that the defendant's actions were motivated by discrimination"; and (3) must demonstrate that "others not within the protected class did not suffer similar adverse . . . actions." *Florentino v. City of Newark*, No. 2:19-cv-21055 (BRM-SCM), 2020 U.S. Dist. LEXIS 157264, at *35 (D.N.J. Aug. 31, 2020) (quoting *Partovi v. Felician*

*Coll.*, No. A-1961-09T1, 2011 N.J. Super. Unpub. LEXIS 645, at *7-8 (App. Div. Mar. 15, 2011)). Indeed, a "conclusory allegation of discrimination does not satisfy the pleading requirements" of a cognizable public accommodation claim under the NJLAD. *Partovi*, 2011 N.J. Super. Unpub. at *8 (citing *Glass v. Suburban Restoration Co.*, 722 A.2d 944 (N.J. App. Div. 1998)); *see also Glass*, 722 A.2d at 948 ("It has long been established that pleadings reciting mere conclusions without facts and reliance on subsequent discovery do not justify a lawsuit.")

There is no dispute that Plaintiffs belong to a protected class under the NJLAD on the basis of their gender and that Edna Mahan is a place of public accommodation. *See Freeman v. McDonnell*, No. 18-7802 (BRM) (ZNQ), 2021 U.S. Dist. LEXIS 21262, at *17 (D.N.J. Feb. 4, 2021). However, Count Six should be dismissed because Plaintiffs fail to plead facts establishing the second and third elements of a LAD claim. No facts alleged in the Amended Complaint support a finding that the Policy was "motivated by discrimination" against cisgender women housed at Edna Mahan. Plaintiffs allege only in conclusory language that "[t]he favoritism and unequal treatment between the male alleged transsexual [sic] inmates and the female inmates at EMCFW has resulted in discrimination against the female inmates at EMCFW." Am. Compl., ¶ 95. However, even accepting those allegations as true (contrary to the law), Plaintiffs still cannot show that State Defendants were actually *motivated by* discrimination.

Here, the Policy has a stated purpose of protecting transgender, intersex, and non-binary inmates, ensuring their dignity, and allowing them to live consistent with their gender identity. In fact, it was actually developed in the process of settling a LAD suit filed by a transgender inmate, rather than for the purpose of discriminating against cisgender women or anyone else. Thus, Plaintiffs' unsupported conclusions are insufficient to sustain their NJLAD claim.

For these reasons, Count Six must be dismissed.

## POINT V

**COUNT EIGHT SHOULD BE DISMISSED BECAUSE THE POLICY IS NOT SUBJECT TO THE RULEMAKING REQUIREMENTS OF THE NEW JERSEY ADMINISTRATIVE PROCEDURE ACT.**

In Count Eight, Plaintiffs assert the DOC acted improperly by not undertaking formal rulemaking with respect to its policy allowing for the transfer of pre-operative transgender women inmates to Edna Mahan. Count Eight must be dismissed because the policy at issue—directed at a narrow group of people and not interpreting any law or general policy—is not subject to the APA's rulemaking requirements.[7]

---

[7] In addition, Plaintiffs' challenge to the DOC's decision not to engage in formal rulemaking (Count Eight) belongs in the New Jersey Appellate Division, which has exclusive jurisdiction "to review final decisions or actions of any state administrative agency," and not in the trial court where Plaintiffs had filed it. *N.J. Court Rule* 2:2-3(a)(2); *see also Equitable Life Mortg. & Realty Investors v. New Jersey Div. of Taxation*, 376 A.2d 966, 969-70 (N.J. Super. App. Div. 1977) (explaining that even "where inaction by a state agency is challenged, an action in the Law Division rather

Agencies may act informally, or formally through rulemaking or adjudication in administrative hearings. *Texter v. Dep't of Human Servs.*, 443 A.2d 178, 181-82 (N.J. 1992) (citations omitted); *see* N.J. Stat. Ann. § 52:14B-3.2. An agency's ability to select procedures it deems appropriate to accomplish its statutory mission is limited by "the strictures of due process and of the [APA]." *In re Solid Waste Util. Customer Lists*, 524 A.2d 386, 392 (N.J. 1987). The APA defines the critical terms "administrative rule" and "rule" to include an "agency statement of general applicability and continuing effect that implements or interprets . . . policy." N.J. Stat. Ann. § 52:14B-3.2. However, the APA excludes as an "administrative rule" any "statements concerning the internal management or discipline of any agency" and "intra-agency statements." N.J. Stat. Ann. § 52:14B-3.2.

In *Metromedia, Inv. v. Director, Division of Taxation*, 478 A.2d 742, 751 (N.J. 1984), the New Jersey Supreme Court adopted a standard to determine when an administrative agency is required to promulgate rules pursuant to the APA. The *Metromedia* Court held "when the agency action is concerned with 'broad policy issues' that affect a large segment of the regulated or general public, rule-making as such is implicated" and "[w]here the subject matter of the inquiry reaches concerns

---

than review by [the Appellate Division] may be appropriate, but only if the inaction complained of is the nonperformance of mandated ministerial obligations," and holding that "[a]gency rulemaking is not a ministerial function but rather a highly discretionary undertaking")

that transcend those of the individual litigants and implicates matters of general administrative policy, rule-making procedures should be invoked." *Id.*

In *Grimes v. New Jersey Department of Corrections*, the court considered the Department's informal policy that did not permit inmates to place phone calls to "cellular, business or non-traditional telephone service numbers." 174 A.3d 1010, 1012 (N.J. App. Div. 2017). The court found that the calling policy not only concerned inmates but had a significant impact on the general public outside of the prison. *Id.* at 1016. Therefore, it was precluded from exemption as a statement of "internal management or discipline" under N.J. Stat. Ann. § 52:14B-2 and the court found that the policy required formal rulemaking. *Ibid.*

Here, Count Eight should be dismissed because the State policy at issue here affects a "narrow or select group"—transgender, intersex and non-binary inmates and the inmates with whom they are housed—with minimal impact on the general public outside of State prisons. Thus, its adoption was proper and did not violate the APA. This policy is not "intended to have wide coverage encompassing a large segment of the regulated or general public."

Moreover the Policy at issue does not "reflect[] a decision on administrative regulatory policy in the nature of the interpretation of law or general policy" because the DOC implemented the rule change based on an settlement agreement of another matter. Thus, it was not enacted in interpreting any law, but was instead enacted on

the DOC's own accord.

## **CONCLUSION**

For these reasons, Plaintiffs' Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

ANDREW J. BRUCK
ACTING ATTORNEY GENERAL OF NEW JERSEY

By:     *s/ Nicholas Falcone*
        Nicholas Falcone
        Deputy Attorney General

        *s/ Eric Intriago*
        Eric Intriago
        Deputy Attorney General

Dated: December 17, 2021

30