UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JENNIFER PASQUARELLO and MICHELLE ANGELINA,<br><br>　　　　Plaintiffs,<br>　　v.<br><br>GOVERNOR PHIL MURPHY, et al.,<br><br>　　　　Defendants. | Hon. Zahid N. Quraishi, U.S.D.J.<br>Hon. Douglas E. Arpert, U.S.M.J.<br><br>CIVIL DOCKET NO.<br>3:21-cv-18806 |

BRIEF IN REPLY TO PLAINTIFFS' OPPOSITION IN SUPPORT OF
STATE DEFENDANTS' MOTION TO DISMISS

ANDREW J. BRUCK
ACTING ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
*Attorney for State Defendants*

By:　Nicholas Falcone
　　　Deputy Attorney General
　　　NJ Bar ID: 264332018
　　　Phone: (609) 376-2964
　　　Nicholas.Falcone@law.njoag.gov

　　　Eric Intriago
　　　Deputy Attorney General
　　　NJ Bar ID: 274302019
　　　Phone: (609) 376-2135
　　　Eric.Intriago@law.njoag.gov

# **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ............................................................................................................2

   POINT I

      THE DOC'S POLICY IS REASONABLY RELATED TO THE LEGITIMATE PENOLOGICAL INTEREST OF PROTECTING THE HEALTH AND SAFETY OF TRANSGENDER INMATES, AND IS THE LEAST RESTRICTIVE MEANS OF FURTHERING THAT INTEREST ................................................................................................2

   POINT II

      THE CASE LAW THAT STATE DEFENDANTS CITE IN THEIR MOTION BRIEF SUPPORTS THE ARGUMENTS MADE THEREIN, DESPITE PLAINTIFFS' ASSERTIONS TO THE CONTRARY .......................................................10

CONCLUSION .......................................................................................................13

## Table of Authorities

**Page(s)**

### Cases

*De Veloz v. Miami-Dade Cty.*,
  756 Fed. Appx. 869 (11th Cir. 2018) ............................................................. 3, 4

*Dehart v. Horn*,
  227 F.3d 47 (3d Cir. 2000) (en banc) ................................................................. 2

*Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018) ....................................................................... 2, 3, 5

*Doe v. Delie*,
  257 F.3d 309 (3d Cir. 2001) .................................................................... 1, 2, 3, 5

*Driever v. United States*,
  Civil Action No. 19-1807 (TJK), 2020 U.S. Dist. LEXIS 192695
  (D.D.C. Oct. 19, 2020) ......................................................................................... 4

*Franklin v. District of Columbia*,
  163 F.3d 625 (D.C. Cir. 1998) ............................................................................. 2

*Ochs v. Thalacker*,
  90 F.3d 293 (8th Cir. 1996) ................................................................................. 4

*Olim v. Wakinekona*,
  461 U.S. 238 (1983) ............................................................................................. 2

*Pryor v. Department of Corrections*,
  929 A.2d 1091 (N.J. Super. App. Div. 2007) ..................................................... 1

*In re Rules Adoption Regarding Inmate Mail to Attys.*,
  576 A.2d 274 ........................................................................................................ 1

*Turner v. Safley*,
  482 U.S. 78 (1987) ....................................................................................... 1, 2, 3

*West v. Kind*,
  No. 17-cv-482-pp, 2020 U.S. Dist. LEXIS 40210 (E.D. Wis.
  March 9, 2020) ...................................................................................................5

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ...........................................................................2

**<u>Statutes</u>**

42 U.S.C. § 1983 ....................................................................................................1, 3

**<u>Other Authorities</u>**

28 C.F.R. § 115.42(g) .................................................................................................3

**PRELIMINARY STATEMENT**

In opposing State Defendants' motion to dismiss, Plaintiffs leave no doubt that they maintain a narrow definition of "transgender," which they would have this court impose upon the Department of Corrections. Specifically, Plaintiffs contend that transgender women who have not undergone gender-confirmation surgery are not truly transgender, and should not be treated as women under the law. Plaintiffs repeatedly object to the presence of "male alleged transgender inmates" at Edna Mahan, and assert that the mere presence of these individuals violates their rights under the Federal and State Constitutions, and multiple statutes. In their view, trans-women like Plaintiff Angelina—who have undergone such surgery—are entitled to be housed at Edna Mahan, but all others are not.

But Plaintiffs' desired definition—based wholly on the appearance of an inmate's genitalia—conflicts with federal law; specifically, federal standards issued under PREA expressly forbid corrections departments from defining an inmate's gender based solely on that criterion. Further, the Department's policy withstands constitutional scrutiny because it is rationally related to the legitimate interest of promoting the health, safety, and welfare of transgender inmates in the State's custody, and is the least restrictive means of doing so. And, even if Plaintiffs' asserted theory states a prima facie cause of action under RLUIPA, the policy is

nevertheless lawful because it poses the least restrictive means of achieving the compelling interest at the heart of the policy.

## ARGUMENT

### POINT I

THE DOC'S POLICY IS REASONABLY RELATED TO THE LEGITIMATE PENOLOGICAL INTEREST OF PROTECTING THE HEALTH AND SAFETY OF TRANSGENDER INMATES, AND IS THE LEAST RESTRICTIVE MEANS OF FURTHERING THAT INTEREST.

As State Defendants argue in their motion brief, Plaintiffs have failed to state a claim under 42 U.S.C. § 1983 or the New Jersey Civil Rights Act. Because Plaintiffs challenge an official prison policy on constitutional grounds, the applicable standard is that of *Turner v. Safley*, 482 U.S. 78, 89 (1987). The *Turner* standard applies to Plaintiffs' New Jersey Civil Rights Act claims as well. *See In re Rules Adoption Regarding Inmate Mail to Attys.*, 576 A.2d 274, 279 (N.J. 1990); *see also Pryor v. Department of Corrections*, 929 A.2d 1091, 1102 (N.J. Super. App. Div. 2007) (noting "the state constitution provides no more protection than the Federal Constitution on these issues").

The Court in *Turner* held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. The standard requires courts to "respect the administrative concerns underlying a prison regulation, *without requiring proof that*

*the regulation is the least restrictive means of addressing those concerns.*" *Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001) (emphasis added). As the *Delie* court explained the standard:

> [Turner] directs courts to assess the overall reasonableness of such regulations by weighing four factors. First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.
>
> [*Id.* (quoting *Dehart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (en banc)).]

*Turner* also "assumes as a predicate that the plaintiff inmate has demonstrated that a constitutionally protected interest is at stake." *Id.* For the reasons articulated in State Defendants' motion brief, Plaintiffs have not done so.

Moreover, contrary to Plaintiffs' assertions in their opposition, State Defendants did argue that the Policy does not violate any constitutional rights. Specifically, State Defendants noted that merely housing both cisgender and transgender women at Edna Mahan Correctional Facility is not itself a constitutional violation because inmates do not have a constitutionally protected interest in their

3

place of confinement—let alone rights to dictate the housing assignment of *other inmates. See Olim v. Wakinekona*, 461 U.S. 238, 248 (1983) (no protected interest in an inmate's own place of confinement); *Franklin v. District of Columbia*, 163 F.3d 625, 631, 634-35 (D.C. Cir. 1998) (absent "extraordinary" treatment, "day-to-day" judgments about placement, housing, and classification are "ordinary consequence[s] of confinement for committing a crime"). Plaintiffs base their constitutional claims on a manufactured distinction between transgender women who have undergone gender-confirmation surgery, such as Plaintiff Angelina, and transgender women who have not undergone gender-confirmation surgery. *See* ECF No. 28, at 4 ¶ 10. Yet Plaintiffs cite no support for the notion that such a distinction is constitutionally meaningful. And to the contrary, federal and state law expressly forbid Plaintiffs' demand to use genital status as the exclusive basis for such a housing decision. *See* 28 C.F.R. § 115.42(g) (prohibiting corrections agencies from placing "transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is…established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates); *see also* N.J.S.A. § 10:5-4 ("All persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . .

without discrimination because of . . . sexual orientation, . . . sex, gender identity[.] This opportunity is recognized as and declared to be a civil right.")

Even if Plaintiffs could demonstrate that a valid constitutional interest is at stake, the DOC Policy satisfies the *Turner* standard. As just laid out above, the DOC Policy exists "to address the needs of transgender, intersex, and non-binary inmates in a manner consistent with the federal Prison Rape Elimination Act (PREA) standards, the New Jersey Law Against Discrimination (NJLAD), and in accordance with departmental regulation, policies and procedures." ECF No. 19-3, at 4. As the Third Circuit has plainly stated, "[t]here can be 'no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.'" *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3d Cir. 2018) (quoting *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017)). Thus, promoting the health and safety of transgender, intersex, and non-binary inmates is clearly a legitimate penological and governmental interest. And by being consistent with federal PREA standards, the DOC Policy furthers these legitimate interests by requiring a case-by-case assessment of whether placement would promote the transgender inmates' safety and not present security concerns, 28 C.F.R. § 115.42(c), making clear that a transgender inmates' own views with respect to their gender identity shall be seriously considered in housing determinations, 28 C.F.R. § 115.42(e), and

prohibiting the Department from searching or examining a transgender inmate for the sole purpose of determining that inmates' genital status. 28 C.F.R. § 115.15.

By creating a procedure for determining an inmate's gender identity, and a presumption that a transgender inmate will be housed in a facility consistent with her gender identity, the DOC Policy directly supports that interest. Specifically, the Policy provides that "[i]nmates identified as transgender, intersex, or non-binary, including those who self-identify, will be referred to the Institutional PREA Compliance Manager (IPCM)," who will then meet confidentially with the inmate. ECF No. 19-3, at 5. The DOC then performs a classification review, which includes "consider[ation] [of] whether the particular placement would present management or security problems in all housing and programmatic assignments." *Id.* Such potential problems "may justify a deviation form an inmate's presumptive placement in line with gender identity for cisgender, transgender, intersex, and non-binary inmates alike." *Id.* That said, "under no circumstances will a transgender, intersex, or non-binary inmate's placement in line with their gender identity be considered a management or security problem solely due to their gender identity." *Id.*

In opposition, Plaintiffs ignore that individualized-assessment procedure and contend that the DOC Policy does not provide for any vetting of inmates and their professed gender identities, thus "open[ing] the door to malingering and false claims by male inmates that they 'identify' as female." ECF No. 28, at 4 ¶ 11. But because

6

the Policy does in fact establish a comprehensive procedure for identifying inmates' gender identities via an individualized process for the purpose of housing and classification reviews, Plaintiffs' argument lacks merit. Plaintiffs similarly argue that the Department's policy wholly disregards the safety of the other female inmates housed at Edna Mahan. But, on its face, the Policy actually requires that the safety of other inmates be considered by considering factors such as "criminal history," "institutional disciplinary history," and "likelihood of perpetrating sexual abuse" when making housing and classification considerations for each inmate. ECF No. 19-3, at ¶ IV, B, 4, b, iii.

With respect to the final two prongs of the *Turner* standard, Plaintiffs argue that "[t]he safety of the male alleged transgender inmates could be readily accommodated by alternative means – the establishment of a dedicated housing unit in the men's prison or a separate prison facility for such inmates," with no effect on Plaintiffs. ECF No. 28, at 11. As the Third Circuit has held, *Turner* does not require proof that a prison policy is the least restrictive means available. *Doe*, 257 F.3d at 317. That said, as State Defendants argued in their motion brief, the Policy is the least restrictive means available because there is no reasonable alternative that would both further the legitimate interest at stake and come at a de minimis cost. To house transgender inmates in a separate housing unit or facility would isolate transgender inmates for the sole reason that they are transgender, and run afoul of PREA

standards, state law, and guidance from the courts. *See* 28 C.F.R. § 115.42(g) ("The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status"); *Doe*, 897 F.3d at 530 (explaining that "forcing transgender students to use single-user [bathroom] facilities or those that correspond to their birth sex [would] not serve the compelling interest" of protecting transgender students, and would in fact "significantly undermine it"); *see also* N.J.S.A. § 10:5-4 ("All persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . sexual orientation, . . . sex, gender identity[.]").

This analysis supports State Defendants' RLUIPA argument as well. As detailed above, the policy is the least restrictive means of furthering the compelling interest of protecting transgender inmates. For that reason and the reasons argued in State Defendants' motion brief, including the fact that the Policy does not create a substantial burden on any sincerely held religious belief, Plaintiffs' RLUIPA claim should be dismissed. *See* Point II, *infra* (discussion of case law supporting dismissal of Plaintiffs' RLUIPA claim).

In further opposition, Plaintiffs cite to *De Veloz v. Miami-Dade City*, 756 Fed. Appx. 869 (11th Cir. 2018). There, jail staff incorrectly identified a cisgender female inmate as male based on the fact that she was undergoing hormone replacement

8

therapy for menopause, and transferred that inmate to an all-male facility. *Id.* at 872. The inmate told medical staff "that she was a woman and did not understand why her gender was being questioned." *Id.* In reversing an order dismissing certain Section 1983 claims, the Eleventh Circuit held that "the extensive facts alleged in the second amended complaint give rise to the inference that, at a minimum, [jail medical staff] 'strongly suspected' that Mrs. Pichardo was female but 'refused to verify the underlying facts' that would prove her female gender to be true,'" and that staff "deliberately disregard[ed] the wealth of information that Mrs. Pichardo was female." *Id.* at 878, 880.

In that case, the court addressed only the executive act of placing a specific cisgender woman in an all-male jail facility. *De Veloz* is inapposite here where Plaintiffs are challenging a comprehensive policy requiring that housing decision be based upon an individualized assessment of each inmate based on a variety of factors, including the individuals' expressed gender identity. Indeed, the housing placement in *De Veloz* was done despite the plaintiff voicing her strong objection to being housed with males, and seemingly despite all available information contradicting that placement other than the facts that she was undergoing hormone replacement therapy at the time and a nurse had asserted that she had male genitalia. *Id.* at 872-73. Plaintiffs' reliance on this case is both ironic and flies in the face of logic given that their own prescribed remedy—categorizing inmates based solely on

9

their physical appearance—is similar to the wrong that the defendants committed in *De Veloz* according to the Eleventh Circuit.

For these reasons and the reasons articulated in State Defendants' motion brief, Plaintiffs' constitutional claims should be dismissed.

### POINT II

CASE LAW THAT STATE DEFENDANTS CITE IN THEIR MOTION BRIEF SUPPORTS THE ARGUMENTS MADE THEREIN, DESPITE PLAINTIFFS' ASSERTIONS TO THE CONTRARY.

In opposition, Plaintiffs challenge State Defendants' reliance on several significant decisions based on either immaterial distinctions or by mischaracterizing State Defendants' reason for citing them. However, those cases support State Defendants' arguments and the dismissal of this case.

First, Plaintiffs contend that State Defendants' reliance on *Ochs v. Thalacker*, 90 F.3d 293 (8th Cir. 1996), in the context of Plaintiffs' claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), is misplaced. In *Ochs*, the plaintiff was a white supremacist who claimed that his beliefs as a "Church of Jesus Christ Christian" prohibited him from being housed with African American inmates. *Id.* at 296. While the court affirmed the dismissal of Ochs's claims on other grounds, it also voiced skepticism that merely being housed with inmates of another race could constitute a substantial burden. *Id.* In doing so, the court noted that while Ochs' claim was based on a purported religious mandate, it was "directed at an entirely

10

secular aspect of life, the race of his cellmate." *Id.* The court noted that, by recognizing such a claim as placing a substantial burden on religious exercise, such claims could disrupt virtually every other entirely secular aspects of prison life for the entire prison population such as "the timing of meals, the number of showers, the television programs and movies to be viewed, or most any other aspect of prison life." *Id.*

In their opposition, Plaintiffs point to obvious factual distinctions in *Ochs,* such as that the plaintiff in that case objected to the race of other inmates, to claim that the case has no bearing here. Plaintiffs further conflate their claims based on religious objections with a separate non-germane concern for the general safety when being housed near pre-surgery transgender inmates. But State Defendants' point in citing *Ochs* is that Plaintiffs' RLUIPA claim similarly seeks to disrupt "an entirely secular aspect of life" in prison—the housing assignment of fellow inmates—and thus does not create a substantial burden on Plaintiffs' religious beliefs. *Ochs* is an example of a decision rejecting a similar RLUIPA claim—one in which the plaintiff asserts that the mere presence of another person offends their religious sensibilities—rather than a more typical claim where prison officials somehow prevent the plaintiff from engaging in a specific religious practice. *See also Driever v. United States*, Civil Action No. 19-1807 (TJK), 2020 U.S. Dist.

11

LEXIS 192695, at *26-27 (D.D.C. Oct. 19, 2020); *West v. Kind*, No. 17-cv-482-pp, 2020 U.S. Dist. LEXIS 40210, at *32 (E.D. Wis. March 9, 2020).

Plaintiffs also challenge State Defendants' reliance on *Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018). ECF No. 28, at 8. Plaintiffs correctly state that *Doe* concerned the use of bathrooms by transgender students, rather than housing assignments of transgender inmates. But State Defendants have not presented *Doe* as factually resembling this action. Rather, *Doe* is significant because in its decision, the Third Circuit addressed legal issues that bear directly on Plaintiffs' claims. For one, the court plainly stated that "[t]here can be 'no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.'" *Doe*, 897 F.3d at 528. The court also addressed the notion of requiring transgender individuals to use a separate, dedicated facility, which Plaintiffs have suggested here, holding that "forcing transgender students to use single-user [bathroom] facilities or those that correspond to their birth sex [would] not serve the compelling interest" of protecting transgender students, and would in fact "significantly undermine it." *Id.* at 530. In other words, *Doe* both establishes the legitimacy of the interest served by the DOC Policy, and shows that Plaintiffs' proposed alternative means of furthering that policy would directly undermine those important interests.

## **CONCLUSION**

For these reasons, and those set forth in State Defendants motion to dismiss, Plaintiffs' Amended Complaint should be dismissed with prejudice.

        Respectfully submitted,

        ANDREW J. BRUCK
        ACTING ATTORNEY GENERAL OF NEW JERSEY

By:   *s/ Nicholas Falcone*
       Nicholas Falcone
       Deputy Attorney General

       *s/ Eric Intriago*
       Eric Intriago
       Deputy Attorney General

Dated: January 20, 2022